# CHARLESTON

STATE *v.* KING *et al.*

Submitted November 13, 1908.    Decided December 22, 1908.

1. TAXATION—*Forfeiture of Land—Operation and Effect.*

    Under early Virginia statutes, applicable to the subject, forfeiture of a particular land title for non-payment of taxes assessed upon the land or non-entry thereof upon the books of the commissioner of the revenue, was complete, embracing the whole title, not partial, reaching only certain estates or interests, held under the title. (pp. 555, 556.)

2. SAME.

    A legislative act, passed by the General Assembly of Virginia, March 15, 1838, providing that "all the right, title and interest

of the commonwealth, or of the president and directors of the literary fund, to any land owned by" a certain person then dead, "under title, legal or equitable * * * and which have been forfeited to the commonwealth, or said literary fund, for the non-payment of the taxes charged thereon, or for failing to enter the same on the land books of the Commissioner of the Revenue, * * * shall be and the same is hereby transferred to, and vested in," a certain person in trust for certain purposes, subject only to the proviso that the transfer or grant should not affect the right or title of any *bona fide* occupant, acquired by pre-existing law, vested in the trustee the complete original title under which such deceased person had held, except as aforesaid, although, at the time of the forfeiture, he or his heirs may have had only the equitable title or an undivided interest in the land, or no title to, or interest in, it at all, the phrase "to any lands owned by * * * under title, legal or equitable," being regarded as descriptive of the land, not the interest or estate, granted. (p. 555.)

3. SAME—*Redemption—Owner of Undivided Interest.*

Under the provisions of section 17 of chapter 105 of the Code, section 3529, Code of 1906, the owner of an undivided interest in land may fully redeem the tract in respect to which he owns such interest, if the same be open to redemption by any other, or all, the owners under the same title, since redemption, like forfeiture, must always be of the full fee simple title of so much of the land as is redeemed, not of mere interests or estates therein. (p. 558.)

4. JUDGMENT—*Persons Bound—Persons Investigating Appeal.*

Persons who were not in any sense parties to a cause in the trial court, at the time of the entry of an appealable decree therein, do not subject themselves to such decree by instigating or encouraging an appeal therefrom, on which it is affirmed wholly or in part, and aiding in the prosecution thereof. (p. 559.)

5. SAME—*Additional Parties.*

Persons made parties to a cause, for the first time, after the partial reversal, by the appellate court, of a decree therein, and the remanding of the cause, are not bound by such decree in so far as it was affirmed, although they procured the filing of an amended bill by which they were so made parties and defrayed expenses incident to the issuance and service of the process thereon. (p. 560, 561.)

6. BOUNDARIES—*Ascertainment—Reference to Commissioner.*

Reference of a cause to a commissioner, to ascertain and report the location of a disputed boundary line, is proper when the evidence is conflicting as to the identity of monuments called for in the title papers; the identity of monuments and application of the description found in the deed, patent or other muniment of title to its subject matter being questions of fact, and the rules, applicable to undisputed or clearly established facts, questions of law. (p. 566.)

7. EQUITY—*Appeal and Error—Finding of Commissioner—Conclusiveness—Review.*

The finding of a commissioner in chancery on a question of fact has not the force of the verdict of a jury in a law case, nor on an issue out of chancery. Though entitled to peculiar weight, the chancellor, if dissatisfied with it, may set it aside on exception and adopt his conclusion as to what the evidence proves; and, on appeal, the finding of the commissioner will be regarded merely as a circumstance, of more or less weight, to be considered with the evidence, in testing the correctness of the finding of the court. (p. 567.)

8. BOUNDARIES—*Relative Importance of Conflicting Elements.*

Quantity, courses and distances, mentioned in the description of land, must yield to identified monuments, when there is conflict; and mere conflict in the evidence, as to the identity of monuments, does not preclude the application of this rule; it being the duty of the court or jury, as the case may be, to determine, from the evidence, whether the objects in question are the monuments called for. (pp. 568, 570.)

9. EVIDENCE—*Declarations of Adjoining Owner.*

The declaration of a deceased adjoining owner of land as to the location of a corner or line, to be admissible, must relate to a line or corner of his own land, in the ascertainment of which he has an interest. (p. 572.).

10. SAME—*Declaration by Tenant or Equitable Owner.*

If in other respects unobjectionable, such a declaration made by a tenant or equitable owner, is admissible, if paper title in the landlord or trustee be shown. (p. 572.)

11. SAME—*Declaration by Land Owner—Experimental Surveys.*

Experimental surveys and maps thereof, made at the instance of a land owner, endeavoring to find the boundaries of his land, cannot be given in evidence against him as admissions as to boundary locations, unless accompanied by evidence appreciably tending to prove his adoption thereof as being correct. (p. 573.)

12. SAME—*Declarations—Caveat Cases.*

In proceedings, founded on a *caveat*, for the determination of the location of boundary lines of entries and surveys, preparatory to the procurement of patents, the rules of evidence, relating to admission of the parties and locations made by them, are more liberal than those applied in proceeding to determine the location of lines designated in patents; the difference being analogous to that obtaining between proceedings for the enforcement of executory contracts of sale of land and those pertaining to the vindication of legal rights accruing under deeds of conveyance, (p. 578.)

13. BOUNDARIES—*Estoppel—Representations.*

Represenations as to the locations of boundary lines, consisting of reports of surveys and maps filed in judicial proceedings, do

not estop a subsequent purchaser of the land, on the theory of acquiescence or otherwise, in favor of persons who were not parties to such proceedings, though they may have purchased lands on the faith of such representation. Acquiescence, to fix boundary lines, must be in the nature of an argeement evidenced by acts done upon the land, tending to prove an agreement upon definite lines and corners. (p. 579.)

14. SAME—*Surveys—Admissibility in Evidence.*

Though a survey on which no patent ever issued is not admissible to prove the identity and locations of boundary lines and corners of an adjacent survey, carried into grant by the issuance of a patent, if both surveys were made by the same surveyor, and the former only a few months later than the other, and the surveyor has long since died, it may be given in evidence to prove the names borne by streams and other natural objects, called for in the surveys and situate in the vicinity thereof, at the dates of the surveys, and the surveyor's knowledge of these facts, if such names and knowledge thereof become material, they being mere subsidiary issues, bearing indirectly and resultantly upon the main issue in the case. (pp. 573, 574.)

15. CONSTITUTIONAL LAW—*Due Process of Law—Sale of Forfeited Lands.*

Chapter 42, Acts of 1905, is not in violation of the federal or state constitution as depriving former owners of forfeited land of vested rights or property without due process of law. (p. 584.)

16. SAME—*Vested Rights—Impairment of Contract Obligations.*

In a suit by the state to sell land as forfeited for non-entry on the tax books, the former owner, King, asked redemption, and he paid into court the money fixed for redemption, and a decree was made that he had right of redemption. Upon appeal the decree was reversed in so far as it fixed the sum and declared that redemption had been effected, and the case was remanded to require King to specify the parts of the tract he wished to redeem, and held the amount paid in not sufficient. King did not thus acquire a vested property right to redemption, nor had he a contract with the state free from impairment by the Legislature; nor was a sale of the land thereby created by the state to King. Chapter 42, Acts 1905, is not invalid as impairing any such contract or vested right. (p. 585.)

17. TAXATION—*Forfeitures—Effect.*

Land once sold as forfeited for non-entry on the tax books or transferred to junior claimants by the constitution, cannot be again sold by the state, unless the title so sold or transferred has been itself forfeited; nor in such case can it be redeemed by the former owner. (Acts 1905, ch. 42.) (p. 586.)

18. SAME—*Redemption.*

If the state has no right to sell forfeited land because she has once sold it under decree for some forfeiture, or it has been

transferred to a junior claimant by section 3, Art. XIII, of the Constitution, the owner of the forfeited title cannot redeem. (p. 588.)

19. SAME.

The privilege given by statute to redeem forfeited land is the mere grace of the state, not its duty, and does not constitute a vested property right in the former owner. (p. 590.)

20. SAME—*Conveyance by State—Operation and Effect.*

The transfer to other claimants of land made by section 3, Article XIII, of the Constitution, and also a conveyance under a sale in a suit to sell land as forfeited, constitute grants of the state and create new and original title. (p. 590.)

21. SAME—*Forfeitures—Redemption.*

A sale of land as forfeited under decree passes to the purchaser, when conveyed, all right, title and interest vested in the state at the time by forfeiture, whether derived by forfeiture of one or more titles; but only so far as title remained in the state at the date of sale, and not transferred to another by the constitution or before sold as forfeited. Redemption goes no further. Neither affects junior claimants, unless their title was at the time forfeited. (p. 592.)

22. CONSTITUTIONAL LAW—*Vested Rights—Rules of Evidence.*

There is no vested right in rules of evidence, and as they only concern the remedy, it is within the constitutional power of the Legislature to change them or fix the burden of proof. (p. 593.)

23. TITLE OF ONE REDEEMING FROM FORFEITURE.

Does Chapter 42, Acts 1905, give one redeeming his land from forfeiture not only his former title, but other forfeited title? (p. 593.)

24. STATUTES—*Effect of Partial Invalidity.*

Though one provision of statute is repugnant to the constitution, yet if it is distinct in operation and separable from the balance, that provision will be ignored, and the balance stand good. (p. 595.)

25. CONSTITUTIONAL LAW—*Impairment of Contract Obligations.*

When a former owner of forfeited land asks to be allowed to redeem, that does not create a contract by the state with him to allow redemption. The statute allowing redemption is not an offer by the the state to sell land which, when so accepted, makes a contract by the state to sell. Until actual redemption by payment and a decree of redemption there arises no vested right of property or contract. (p. 597.)

26. SAME—*Due Process of Law—Forfeiture of Land for Nonentry on Tax Books.*

Article XIII, section 6, State Constitution, forfeiting land for

non-entry on the tax books, is again held not contrary to the Four- , teenth Amendment of the federal constitution.  (p. 603.)

27.  SAME— *Vested Rights—Rules of Evidence.*
    The Legislature can make a deed *prima facie* evidence of its re-
    ·  citals or the facts stated therein.  (p. 599 )

Appeal from Circuit Court, Marion County.

. Suit by the State against Henry C. King and others. Decrees for the State, and King appeals.

*Affirmed.*

MAYNARD F. STILES, for appellant.

JOHN F. DILLON, HARRY HUBBARD, C. W. CAMPBELL, EDWARD C. LYON, SHEPPARD, GOODYKOONTZ & SCHERR, BROWN, JACKSON & KNIGHT, W. B. CORNWELL, LILLY & SHREWSBURY, ANDERSON, STROTHER & HUGHES, FRANK COX, and GEORGE J. McCOMAS, for the State.

POFFENBARGER, PRESIDENT: ·

Henry C. King has appealed from certain decrees made and entered by the circuit court of Marion county in the cause of the State of West Virginia against himself and others. The suit was brought for the purpose of selling, as forfeited for non-entry upon the land books for the purposes of taxation, so much of the western Robert Morris 500,000 acre grant as lies in the State of West Virginia and is not held by purchase from the state or by transfer under section 3 of Art. XIII of the Constitution so as to prevent such sale. The suit was commenced in the circuit court of Wyoming county in 1893. On the 30th day of September, 1897, a decree was entered permitting King to redeem an unidentified 10,000 acres of the tract, taxes on which he paid in at the time, and defining the boundaries of the entire tract in accordance with a survey made by one W. D. Sell. The State, on appeal from this decree, obtained a partial reversal of it and the cause was remanded with leave to King to file a petition, accurately and definitely locating the 10,000 acres on which he had paid into court the taxes. See *State* v. *King*, 47 W. Va. 437. Afterwards the cause was removed to Cabell county and then to Marion. While pending in these various courts and before removal to Marion county, a great many

new parties were brought into the cause on amended bills filed by the state and many of these new parties came in and set up in their answers claims to superior title to portions of the land, some small and some great, by purchase from the State at sales made by commissioners of school lands under decrees, and by transfer of the forfeited King title under the provisions of section 3 of Article XIII of the Constitution, and insisted upon the dismissal of the suit as to the tracts of land so claimed. The new parties asserting these claims also contested the correctness of the boundary of the Robert Morris grant as claimed by King and recognized by the decree of September 30, 1897. While the cause was in the circuit court of Cabell county it was referred to a commissioner of that court to take the testimony and report, among other things, the quantity, description and location of the portions of the Morris grant, the title to which then remained in the State and was subject to sale for the benefit of the school fund. After having taken and considered a vast amount of testimony he adopted substantially the Sell survey, departing from it only in respect to the fifth line which occasioned a change in the location of the sixth or northern line so as to exclude a considerable portion of the land claimed by King. On the 6th day of December, 1905, the circuit court of Marion county, on exceptions to the report of the commissioner, disapproved this finding and fixed the boundary in accordance with the contention of the defendants who were contesting King's right to redeem. As the boundaries were located by the circuit court, the entire Morris grant contains about 97,000 acres. As claimed by King and reported by the commissioner, they make the tract contain 500,000 acres or more. Having so limited the area of the Morris grant, the circuit court of Marion county dismissed a great many of the tracts to which superior title was claimed by defendants other than King, on the ground that they were outside of the boundaries of the Morris grant and so not liable either to sale by the State or redemption by King. Other tracts lying within the boundaries as located by the circuit court were dismissed on the ground that superior title was held by the claimants under the provisions of section 6 of chapter 105 of the Code, as amended by chapter 42 of the Acts of 1905. This appeal is from the decree of

Dec. 6, 1905, defining the boundaries of the Morris grant; decrees entered December 7, 1905, dismissing the suit as to lands claimed by (1) Egbert Mills and others, (2) Wm. J. Canady, (3) Alexander Stafford and Loventia Stafford, (4) Robert White and others, (5) Joseph W. and George Hinchman, (6) Richard Torpin and others, (7) W. A. Johnson, (8) A. H. Toler and others, (9) James Hatfield (10) Bruce McDonald and others, (11) The Turkey Land Company, (12) sundry persons; decrees entered December 8, 1905, dismissing the suit as to lands claimed by (1) Alexander Varney, (2) Chas. L. Tracy, (3) Alexander Trent, (4) Elijah Ferrell; and decrees entered March 6, 1907, dismissing the suit as to lands claimed by (1) Paren Christian, (2) Milton G. Browning and others. In the same case, King obtained other appeals from other decrees, which will not be noticed in this opinion.

By cross assignment of error, counsel for claimants adverse to King attacked the title of the latter. In other words they say the persons under whom King claimed did not own the land at the time of the alleged forfeiture thereof for non-entry upon the land books. The basis of this contention is that the Morris title, at the date of an alleged forfeiture between the years 1811 and 1838, had been conveyed away by persons from whom King claims to deduce title. The grant was made to Robert Morris in 1794. Soon afterwards, he conveyed the land to James Swan. A power of attorney executed by Swan, reciting that he had sold the land in the year 1797 and a copy of the deed, or a draft of a deed unsigned, with an attestation upon it signed by Swan, are relied upon to prove these conveyances. In the former paper Swan recited that he had conveyed an undivided quarter of the land to Henry Jackson, Moses Michael Hays and John Coffin Jones in trust for Pierre Leroy Dallarde, and a one-half undivided interest to John Vaughan, Henry Jackson and ......................... in trust for John Gaspard Schweitzer. Another basis for the claim of outstanding title is a deed dated August 30, 1830, by which Swan conveyed all of his land in Virginia and Kentucky, described as being more than 2,500,000 acres, to Samuel Allison who, by deed dated July 16, 1838, conveyed them to Darius Blake Holbrook, who, on the 18th day of May, 1839, conveyed

them to Henry W. Tregent. Some attempt is made by King to show that the Dallarde and Schweitzer interests were afterwards gotten in by King's predecessors, but no conveyance to any of them by Tregent is shown. However, it appears that the deed from Swan to Allison was accompanied by a defeasance, showing that Allison had been clothed with the legal title for the sole purpose of enabling him to sell the lands for the benefit of Swan, and that Swan held the equitable title. It is also apparent that the conveyance to trustees for Dallarde and Schweitzer, if they could be regarded as proven, deprived Swan of only an undivided three-fourths of the land. Not all of it. Hence it is apparent that he had not wholly disposed of his title.

However this may be, the Morris title was forfeited and vested in the state for non-payment of taxes charged for certain years, and for non-entry for the purposes of taxation for other years. The land was taxed and the taxes paid in the name of Swan for the years 1797, 1798, 1799, 1800, 1801. 1802, 1804, 1805, 1806, 1807, 1809, 1810 and 1811. It was taxed in the name of Swan for the years 1803, 1808, 1812, 1813, 1814 and 1815 and the taxes not paid. It appears to have been returned delinquent for the three years last named. After that it was not on the land books until 1841. The act of the legislature passed December 27, 1790, provided that the title to any tract the taxes whereon were not paid for the space of three years should be forfeited and vested in the commonwealth and the land subject to re-grant in the same manner as waste and unappropriated lands. By the act of July 1, 1829, forfeited lands were made re-deemable but the title remained in the State until redemption was effected. By the acts of April 1, 1831, and February 27, 1835, it was provided that all lands lying west of the Allegheny Mountains theretofore returned delinquent for the non-payment of taxes and which should not be redeemed by the owners within a fixed time, and all tracts of land which the owners had failed to enter on the books of the commissioner of the revenue or should thereafter fail to enter by a given time, and pay the taxes thereon, should be absolutely forfeited to the commonwealth, or the president and directors of the literary fund, and should be thenceforth forever irre-deeemable unless the owner by himself or tenants was in the

actual possession of the land.  The act of 1835 allowed
redemption until July 1, 1836.  This was afterwards ex-
tended to July 1, 1838.  Under these forfeiting statutes
the Morris title, no matter by whom previously held was
forfeited for the non-payment of the taxes for the years
1812 to 1815, and for non-entry upon the land books under
the acts of 1835.  On the 15th day of March, 1838, the Gen-
eral Assembly of Virginia passed an act providing that "all
the right, title and interest of the commonwealth, or of the
president and directors of the literary fund, to any of the
lands owned by James Swan, under title, legal or equitable,
lying west of the Allegheny Mountains, and which have
been forfeited to the commonwealth, or said literary fund,
for the non-payment of taxes charged thereon, or for failing
to enter the same on the books of the commissioner of the
revenue, and having the same charged with all the taxes
chargeable thereon, and paying the same with damages, as
provided by law, shall be and the same is hereby transferred
to and vested, except as hereinafter excepted, in John Peter
Dumas, in trust for the use and benefit of the creditors of
James Swan, discharged from all taxes and damages charged
or chargeable thereon, before the first day of January,
1838."  The exception in the act was in favor of *bona fide*
occupants who had previously acquired title under pre-ex-
isting law.  The preamble of the act recited that Swan had
died seized of various tracts of land west of the Allegheny
Mountains which had been forfeited to the president and
directors of the literary fund, or to the commonwealth; that
he had, by his will, charged these lands with the payment
of his debts; that his personal estate was of no value; that
the debts were due chiefly to officers of the French army
who were in the American service during the Revolutionary
War or their descendants; that the heirs of Swan had re-
leased to the creditors all their interest in the estate; and
that, in the opinion of Dumas, their agent, then in Vir-
ginia, appealing to the liberality of the General Assembly,
their interests would be subserved by abandoning the
lands if the state should require their redemption by pay-
ment of taxes.  In view of this preamble and the terms of
the act it is urged that the legislature intended to vest in
Dumas only such title as Swan died seized and possessed

of, and then, in view of the conveyance in favor of Dallarde and Schweitzer and to Allison, that he had no title. We are not disposed to accept this construction of the act. It never was the policy of the legislature to forfeit or dispose of undivided or particular estates in land. For the satisfaction of her taxes the state looked to and held the corpus of the land, irrespective of particular titles or claims thereto, or, at least, all the right, title and interest that any person could have in the land under a title evidenced by a particular grant. If the Morris title was forfeited for non-payment of taxes charged, or, for non-entry on the books of the commissioner of the revenue, it was wholly forfeited, forfeited as to Dallarde, Schweitzer, Allison, Swan and everybody else, and completely vested in the state. It was not then, and is not now, the policy of the state to tax mere undivided interests or particular estates in land. The title was wholly, not partially, forfeited. That being its condition, the General Assembly granted to John Peter Dumas " all the right, title and interest of the commonwealth, or of the president and directors of the literary fund." The phrase, " to any of the lands owned by James Swan under title, legal, or equitable," we hold to be descriptive of the lands granted by the act, not of the estate in the lands. The recitals of the preamble are not in conflict with this view. They assume that James Swan died seized or possessed of various tracts or parcels of land. This may have been contrary to the fact, but there was no doubt in the minds of the legislature that the title was in the state by forfeiture. The primary object of the recitals was to set forth the considerations, largely patriotic, which moved the General Assembly to the granting of this land, not to define what estate it intended to pass. It was the intention to grant all the title that anybody had held under the Morris grant.

But it is contended that King has not acquired the title vested in Dumas. On September 29, 1846, Dumas conveyed an undesignated, unidentified 300,000 acres of the 500,000 acre tract to John Joseph Marie Schmidt Thornfeld, who conveyed the same to Auguste Marie Francois Firmin Noverre de Sericourt and Louis Desverges de Maupertius, legal representatives and managers of the Virginia Company of Guyandotte. On the dissolution of the Virginia Com-

pany of Guyandotte, this interest passed, by action of its general assembly, to Maupertius, January 26, 1857. The entire 500,000 acres having been sold, as delinquent, and purchased by the state, Wm. B. McClure, Commissioner of School Lands for Wyoming county, brought a suit to sell the same in 1881, in which R. E. Randall, trustee, successor of Dumas, trustee, then dead, was allowed to redeem it. Randall was succeeded in 1886 by John R. Reed, who, as trustee, contracted with David W. Armstrong for the sale of the 300,000 and 200,000 acre interests. By a deed, dated September 29, 1891, Reed and Armstrong conveyed the 500,-000 acre tract to John V. Le Moyne, reserving or excepting therefrom three tracts, containing, respectively, 1,000, 3,000 and 13,000 acres, and any interlock there might be with the McCleary 100,000 acre grant. Le Moyne conveyed to King. A claim of title, deducted by King from the Pittsburg National Bank of Commerce, seems to have originated in a suit brought in Logan county in 1855, by Claude Benarde against Theodore Dallarde and others, for the enforcement of a lien against the 500,000 acre tract, which culminated in a sale of an undivided three-fourths thereof to Anthony Lawson, which he conveyed in 1876 to J. L. Black and A. Suydan. Having later purchased Suydan's interest, Black conveyed it to the Pittsburg National Bank of Commerce. The bank conveyed to Armstrong and he to King.

Conceding, for the argument, all that may be said against King's claim, in view of these mutations of the Dumas title, it still remains that he has, but for the forfeiture, at least an undivided interest in the land under the Dumas legislative grant. The land conveyed to Thornfeld, three-fifths in acreage of the tract, was never selected, nor set apart from the balance. Dumas, after the conveyance to Thornfeld, still owned two-fifths of the land, not separated from the balance, and which he is not shown to have parted with. The Randalls and Reeds succeeded him and sold and conveyed this interest, if nothing more. An undivided interest in land, forfeited for non-entry or sold for delinquency, entitles the owner to redeem. His interest is not severed from that of his associate. It extends to every particle of the land. In case of tenancy in common, each tenant has the right to the possession of every atom of the land and the possession of

one is the possession of the other. The right of redemption is analogous. The state never accepts partial redemption by undivided interests. One who redeems must pay all the taxes on the tract, no matter what his individual interest may be. Nor does a person have to be sole owner to have the right of redemption. Though having only an undivided interest he is an owner, and the state will not release his interest except upon payment of the entire tax. When that is done the entire land, as to all taxes under the particular title, must be redeemed. Thus it becomes unnecessary to inquire whether King is sole owner of the Dumas title. He may redeem, so far as the right of redemption is open to persons claiming under that title, because he owns at least an undivided interest. What share he has, or whether he is sole owner, is a matter with which, it seem to us, strangers to that title have no concern whatever.

The decree of the circuit court of Wyoming county, made on the 30th day of September, 1897, and the partial affirmance thereof by this Court, are relied upon by counsel for the appellant as having settled, in his favor, many questions against the state and the numerous persons who have come into the cause since it was remanded. He insists that this decree is binding upon them as to the location of the boundary line and King's superior title, but for the forfeiture. With the exception of certain claimants of interests in a 480,000 acre Morris grant, not affected by the decrees of dismissal now under consideration, all the parties to the original and four amended bills filed in the circuit court of Wyoming county, before the decree of September 30, 1897, was entered, were King, himself and his predecessors in title. Before the entry of the decree Alexander McClintock had filed a petition claiming a right of redemption in respect to what was known as the DeWitt Clinton survey which partially overlapped the Morris 500,000 acre tract or was supposed to do so. McClintock, however, it seems, had parted with his title before this petition was filed and really had no interest in the DeWitt Clinton land. However that may be, his interests are not affected by the decree dealt with in this opinion. Thus it appears that the appellees were not made parties to the bill by name. On the appeal from

the decree one of the grounds of reversal was that the notice given by the commissioner to whom the cause had been referred, intended to bind unknown parties and give them opportunity to come in and set up their claims, was not posted as required by law. Hence, that these appellees were not parties in the ordinary sense of the term, is manifest. But counsel for the appellant says they are bound by the decree by reason of their subsequent conduct in the cause. This consists, first, of active participation, by attorneys who now represent the appellees, in the procurement and prosecution of the appeal, with the approbation, and at the instance, of some of their present clients; and second, the activity of some of the appellees in causing the commissioner of school lands to file a fifth amended bill after the cause had been remanded, bringing in a large number of new parties, and advancing the money to pay the fees for service of process and other expenses.

We do not think the authorities sustain the position that participation in appeal by strangers to the cause in the court below, or advancing money for the prosecution of the appeal, would make the decree appealed from, after affirmance, binding upon such persons. They had no opportunity to plead in the court below and set up their claims. In the appellate court the record is taken as made in the court below. It cannot be altered. This Court decided the case upon that record. These new parties were not called upon before the decree was entered to come in and make their defense and possibly had no opportunity to do so, because of lack of notice. As we read the decisions, they do not hold persons bound as parties who, because of their interest in the legal questions involved, advance money to pay counsel fees or otherwise aid in the prosecution of an appeal, or even in an action, when they bear no relation to the party aided, such an indemnitor or warrantor, and can not be affected by the decision otherwise than as a precedent. No such relation existed between these new parties and the state. "One who is not a party to an action but who is interested in the matter determined by the judgment, does not become a party so as to be bound by the judgment by becoming a party to an appeal prosecuted therefrom and paying his portion of the expense." *Major* v.

*Cowell*, 51 Cal. 479. *Litchfield* v. *Goodnow's Admr.*, 123 U. S. 549, is authority for the proposition that mere interest in the legal question presented and contribution to the expense of the litigation is not enough to bind a person as a party by estoppel or otherwise, although his property was described in the bill. Counsel for the appellant relies upon a number of cases in which persons were bound as parties because they appeared in the trial court and assumed control and management of the cases, asserting all defenses or claims they cared to set up. *Frank* v. *Wedderin*, 68 Fed. Rep. 818; *Terrel* v. *Baldwin*, 67 Cal. 1; *Wood* v. *Ensill*, 63 Mo. 193; *Stoddard* v. *Thompson*, 31 Ia. 80; *Boyd* v. *Wallace*, 84 N. W. 760; *James* v. *Iron Co.*, 107 Fed. Rep. 597. In others, the parties held bound were privies or indemnitors of the persons made formal parties, having had notice and actively participated in the management of the case in the trial court. *Lovejoy* v. *Murray*, 3 Wall. 1; *Tootle* v. *Coleman*, 107 Fed. Rep. 41; *Theller* v. *Hershey*, 89 Fed. Rep. 575; *Felting Co.* v. *Felting Co.*, 4 Fed. 813; *Tredway* v. *Railroad Co.*, 39 Ia. 663. The decisions here noted, illustrating the principles, and showing the circumstances under which persons not parties may be bound, or not bound, though actual participants in the litigation, seem to agree fully with the text in Black on Judgments, sections 540 and 541, Freeman on Judgments, section 174., and Herman on Estoppel, page 157. There seems to be no authority for the proposition that one who was not a party in any sense in the court below subjects himself to the judgment or decree by participating in an appeal therefrom taken in the name of one who was a party.

In aid of his contention that the appellees are bound by participation in the cause after it was remanded, counsel for the appellant invokes principles applicable to intervention in proceedings *in rem*. It may be true that in such proceedings an intervenor must take the case in the condition in which he finds it and assert his claims subject to all prior orders, judgments and decrees; but a proceeding by the state to sell lands, forfeited for non-entry for taxation, or purchased at delinquent sales and become irredeemable, is not a proceeding of that kind, though it may partake of the nature thereof. The primary object of such

a suit is the sale of the land, not to determine its status as to all persons, for all purposes and in all respects. Sale may be defeated. In a great many instances it is not effected. The suit is dismissed, because the former owner redeems, or the land is found to have been previously sold by the state, or to be held by some person under the provisions of section 3 of Article XIII of the Constitution. Persons bearing such relation to the land are certainly not bound by a decree of redemption, if it can be said that any redemption had been affected at the time of the admission of these new parties. By redemption, the petitioner acquires no other title to the land than was vested in him immediately before the forfeiture, nor does redemption in any wise affect or impair any right, title or interest any other person may have in the land or any part thereof by purchase from the state or under and by virtue of section 3 Article XIII of the Constitution. Code, chapter 105, section 17. The suit is not a proceeding *in rem.* There is no seizure of the land and proclamation thereof. Known parties in interest are proceeded against by summons and others by order of publication as in other civil suits.

On this branch of the case, we conclude that none of the appellees in these appeals are precluded, by the decree of September 30, 1897, from contesting the boundaries of the Morris grant as therein defined, nor from asserting superior title as purchasers from the state or beneficiaries of transfers under the provisions of section 3 of Article XIII of the Constitution. None of these appeals involves any controversy as to King's right to redeem land, within the boundaries as fixed by the decrees of the Marion county circuit court, not claimed by any other person. Hence, there is no occasion for inquiry as to the effect of the decree in such case, although in *King* v. *Mason*, 60 W. Va. 607. there seems to have been no doubt in the minds of the Court that the decree is binding upon the state as to the boundaries and King's right of redemption.

Without the aid of maps, it is difficult to understand the nature and extent of the controversy respecting the boundaries. It involved the quantity and form of the survey and the identity of streams and their courses as well as the existence and identity of trees called for as monuments and the

local conditions, bearing on the question of identity. The grant was founded upon a survey made by one James Taylor, a deputy surveyor of Wythe county, Virginia, who had surveyed many other tracts in the same section of the state, particularly an adjoining 320,000 acre tract for Wilson Cary Nicholas and Jacob Kenney and an adjacent 480,000 acre tract for Wilson Cary Nicholas, lines and corne rs of both of which are called for as monuments of the 500,000 acre grant. The form of the tract, courses, distances and the location of the streams, as shown on the plat, accompanying the survey of James Taylor, on which the grant was founded, are shown by the following map, a reproduction of the survey plat:

The form of the tract and the relations of its lines to the streams, as located by the decree of the circuit court of Marion county, are shown by the following map:

The line A-P, as shown on the latter, is agreed upon. The point A is the beginning corner and the monuments called for at P were fully proven. The call for that line reads as follows: "Beginning at two poplars and two chestnut trees on a branch of Guyandottt River about Six miles from the mouth of Little War Creek a branch of Sandy River being a corner of a survey of said Nicholas of 180,000 acres and a Survey of 320,000 acres made for said Nicholas and Jacob Kenney and with a line of the latter S 35 W 6720 poles crossing a dividing ridge and down War Creek to the mouth crossing Sandy River at six miles crossing Panther Creek at nine miles and crossing several ridges to four white oaks on the North West Bank of Knox Creek." The length of this line as called for by the patent is several miles too long. It falls short about one-third, but its course as located on the ground practically agrees with the call. The next line is described as leaving the Nicholas and Kenney Tract and running west 3840 poles, crossing Knox Creek and some of the branches thereof, running along the spurs of the ridge dividing the waters of said creek and Peters Creek, a branch of Sandy River, to three poplars and a sugar tree by a small branch of Knox Creek. To give this line the distance called for would carry it entirely beyond the waters of Knox Creek and over a dividing ridge on to the waters of Levisa Fork of Sandy River. The next line is described as 8000 poles in length, running due north, crossing Knox Creek at about four miles, Sandy River at 12 miles at the mouth of Turkey Creek and up said creek and the north west fork of the same, crossing Buffalo Creek, Pigeon Creek, the dividing ridge between Sandy and Guyandotte Rivers and Gilbert's Creek, a branch of the Guyandotte, twice, to three sugar trees in a bottom of said river and about 20 poles below the mouth of Gilbert's Creek. Run by course and distance, this line would be several miles west of what are known as Turkey Creek and Gilbert's Creek and would not reach the Guyandotte River by several miles. Nor would it cross Knox Creek. If run, as located by the circuit court, it would cross Tug Fork of Sandy River at the mouth of Turkey Creek and terminate in a bottom at Guyandotte River, but would not cross Pigeon Creek, the headwaters of which are several miles west of the Mouth of

Gilbert's Creek. The course would be diverted from due north to N 39 E, and it would fall short in distance very considerably. The next call is from the mouth of Gilbert's Creek N 10 E 4450 poles crossing Guyandotte River, several small branches and some ridges to pointers. This line located by course and distance, would not reach or cross Guyandotte River. Located as contended for by the defendants, opposing King, it would cross the Guyandotte River four or five times. The pointers called for at the end of it are not found on either location. By both King and his opponents, it is run according to course and distance, but from different beginning points. The next line is described as running due east 6620 poles crossing Guyandotte River and several branches thereof to three sugar trees and a buckeye by a small branch of the same, being the north west corner of the Nicholas 480,000 acre survey. Running this line by course and distance from the corner contended for by King, it would not reach the corner of the 480,000 acre survey· Its course would have to be deflected to the south. The commissioner obviated this change of course by shortening the line I-J, shown on the second plat incorporated herein. The defendants opposing King make this line run from M-O to M-J almost, if not quite, due south, instead of east, giving it about the distance called for. So located, it terminates, however, at what may be, and is by some supposed to be, a corner of the 480,000 acre survey. The last line is described in the patent as running due south 6800 poles crossing Huff or Cain Creek to the beginning. This line as located by the circuit court, runs south from the point M-Z to the point A, but its length is apparently less than one-third of that called for in the patent.

As has already been indicated, the commissioner to whom the cause was referred for the location of boundary lines, as well as other matters, followed substantially the courses and distances called for in the patent, departing from them only in these particulars: He stopped the first line at point P, considering the monuments called for as having been located there and thus shortened the line about one-third. He shortened the fourth line considerably so as to reach the point M by running a line due east. Counsel for the appellant, regarding the question of boundary as one of fact, says it was

properly submitted to the commissioner and that his find-ing, respecting the same, could not be disturbed by the cir-cuit. court, unless it was found to be contrary to the evi-dence or not sustained by the evidence. There is an intima-tion in the brief of counsel for the appellees that it was not a proper question for submission to the commissioner, and, therefore, that his finding could be wholly disregarded. If there had been no conflict in the evidence as to the location and identity of monuments called for in the patent, the question would have been one of law, and a wrong conclu-sion on the part of the commissioner should not have been even persuasive with the court.. If no monuments whatever had been found, the courses and distances would have gov-erned both court and commissioner as matter of law. If all the monuments had been found and completely identified, and the course and distances did not agree with them, the latter must have been disregarded and the lines run from monument to monument, no matter how great the departure from the calls in the patent for course, distance and quantity. But many of the monuments were not found at all. As to their existence or location, there is no evidence whatever. As to some others, much conflicting evidence was adduced as to their location and identity. This presented a question of fact pure and simple, on which it was proper to take the finding of a commissioner. As to the force and effect of such a finding and the power of the court to set it aside on excep-tion, the rule has been stated in different ways and is not as certain and definite as that which defines the power of the court respecting the verdicts of juries, but it seems to be generally admitted that the finding of a commissioner on a question of fact is not of the same dignity or binding force as a verdict. It has been frequently said, however, that his finding should be sustained unless the court is satisfied from the evidence that such findings are erroneous, and that his findings will be given great weight, though they are not as conclusive as the verdict of a jury. *Holt* v. *Taylor*, 43 W. Va. 153; *Reger* v. *O'Neal*, 33 W. Va. 159; *McGuire* v. *Weight*, 18 W. Va. 507; *Hartman* v. *Evans*, 38 W. Va. 669. But there are many instances in which the findings of commissioners on conflicting evidence have been re-viewed and set aside, because the courts were dissatisfied

with them, and there seems to be nothing in the rule, as stated in the decisions referred to, that makes it the duty of the appellate court to reverse the decree of the court below in such cases, unless the former, on a review of the evidence, is dissatisfied with the finding of latter, but, in reaching its conclusion as to the correctness of the decree, the appellate court no doubt gives weight and force to the finding of the commissioner as a circumstance. The supreme court of Virginia, in *Tatum* v. *Tatum*, 43 S. E. 184, held that the trial court was not bound by the findings of the commissioner, but might review and weigh the evidence, and, if not satisfied with the findings, overrule them. See also *Shipman* v. *Fletcher*, 91 Va. 473.

The commissioner regarded the evidence insufficient to prove the mouth of Gilbert's Creek and the mouth of Turkey Creek as points called for in the patent. In this he was governed by evidence tending to prove that, at the date of the survey made by Taylor, September 9, 1794, Turkey Creek was not known by any name, but acquired its name long afterwards; that Gilberts Creek was then and for some years afterwards, perhaps a good many years, known as War Creek; that the sugar trees called for in the river bottom 20 poles below the mouth of Gilbert's Creek had never been seen by any witnesses who testified concerning them; and that Thacker Creek was once known as Turkey Creek and Island Creek as Gilbert's Creek. Some of this evidence was slight, and by far the greater portion of it traditional. There was no effort to prove any trees or marked monuments at the mouth of Turkey Creek. In fact, none are called for in the patent. The trees at the mouth of Gilbert's Creek as to which witnesses testified were not 20 poles below the mouth thereof, but on its bank. Evidence was taken to show that a change in the location of the mouth of Gilbert's Creek, to the extent of about 20 poles, caused by a great freshet, had occurred, so as to make these trees stand on the bank thereof instead of 20 poles below. The commissioner was of opinion that the land 20 poles below the mouth of the creek had all been cleared and was under cultivation as early as 1838, so that certain witnesses, who claimed to have seen such trees, could not have done so by reason of their having been cut down before these

witnesses were born.  Much evidence was also taken to prove that no considerable change had occurred in the location at the mouth of Gilbert's Creek.  As the commissioner does not review the evidence in detail in his report, he was probably influenced by facts and circumstances not mentioned therein, such as Taylor's misconception of the courses and relative positions of the rivers and streams, disclosed by the plat filed with the survey, and his calling for the crossing of Pigeon Creek which is not touched by the line as contended for by the defendants opposing King, known in the record and briefs as "contesting defendants."  His conclusion was that Taylor's survey was an office survey and that he had never been upon the ground nor marked the corners and lines of the 320,000 acre tract, and that he merely platted, or surveyed by projection, in his office, the 500,000 acre tract, so that it might be located upon the ground by courses and distances, thus making his calls for monuments what may be termed "random" calls.

The reasoning of the learned judge of the trial court as to this western line, and the location thereof, so as to run from the mouth of Gilbert's Creek, is in part as follows:

"Taylor seems to have been specially anxious to describe line number three by giving a large number of durable monuments by which to locate it.  The same description, in a general way, will be found in the amended entry of October 28, 1794, but not in the first and second entries.  He says this line begins on a branch of Knox Creek, and running North crossed Knox Creek, and continuing crossed Sandy River at twelve miles; that is, that from this starting point, (the three poplars and a sugar tree by a small branch,) by running North he first crossed the main stream of Knox Creek and then the Sandy River at the mouth of Turkey Creek, that Knox Creek was a branch of Sandy River.  We find all this to be true except the direction.  He says the line crossed Sandy River at the mouth of Turkey Creek.  We find Turkey Creek emptying into the Sandy River.  He says he ran up the North West Fork of Turkey Creek crossing Buffalo and Pigeon Creek, and crossing the dividing ridge between Sandy and Guyandotte, to Gilbert's Creek, crossing it twice; that Gilbert's Creek is a branch of Guyandotte River, and that he located a corner at three

sugar trees in a bottom, on the Guyandotte River about 20 poles below the mouth of Gilbert's Creek. It is said Turkey Creek and Gilbert Creek were not known by these names. at that time; well, without stopping to inquire what induced Taylor to give them such names, the fact exists that the creeks and rivers were there then, substantially as now: some creek, whatever its name, emptied its waters into the Sandy, and another had its mouth on the banks of the Guyandotte. Then draw a line from the Guyandotte River twenty poles from the mouth of this Creek, which Taylor called Gilbert, south, crossing the creek twice, to where this other creek which Taylor calls Turkey Creek enters the Sandy River, and then protract this line until it intersects the southern line and you have the southwestern corner of the survey. Unless Taylor's survey is false and fraudulent from beginning to end, he must have crossed Sandy River at the mouth of a creek, then crossing other creeks, must have reached the Guyandotte River in a bottom some 20 poles below some stream.''

For a more elaborate statement of the evidence relating to the boundary, reference may be had to *King* v. *Watkins,* 55 C. C. A. 290, an action of ejectment in which the same question was in issue and in which the evidence was very much the same as in this case, both in character and extent, except that part of the evidence introduced here had been rejected in the court below, as will be seen by reference to *King* v. *Watkins* in 98 Fed. Rep. 913. In that case, passed upon by two able judges, Paull, District Judge, and Goff, Circuit Judge, no doubt was expressed as to the admissibility of the evidence that went to the jury, and that evidence was the same as the major portion of the evidence in this case. The district court gave instructions which virtually bound the jury to find for the plaintiff. At least, the appellate court were of opinion that the instructions trespassed upon the province of the jury by indicating a preponderance of evidence, or weight of evidence, in favor of the plaintiff, for which reason the judgment was reversed and the case remanded. While these decisions are not binding upon this Court as authority, nor upon the parties here as adjudications, they indicate to us the opinions and views of able jurists, concerning the admissibility and weight of this evi-

dence. Judge Goff intimated, if he did not expressly say, that if the case had gone to the jury under proper instructions, the verdict, whatever it might have been, could not have been disturbed.

The additional evidence in this case, rejected by the court below in *King* v. *Watkins*, consists, for the most part, of testimony of certain witnesses to alleged declarations of Isaac Spratt, a deceased person, relative to three stumps at the mouth of Gilbert's Creek, supposed by King's opponents, to have been the stumps of the three sugar trees called for in the patent. It was rejected in the case of *King* v. *Watkins* on the ground that there was no proof of any paper title in the declarant. The offer was to prove by oral testimony that Spratt was the owner of adjacent land, without the production of any patent, deed or other muniment of title. The syllabus of the case, dealing with this phase of it, says: "The declarations of a deceased person are only admissible to prove the boundary line of a tract of land, on the ground that when they were made he was the owner of an adjoining tract, where his conveyance calls for such line as a common boundary; hence proof that he was in possession under a verbal contract cannot render such declarations competent." The objection to the evidence has not been remedied. The witnesses introduced to prove these declarations were Frederick Trent, R. P. Spratt and F. S. Stafford: Trent says nothing about Isaac Spratt's ownership of the land. Spratt, in response to a question as to ownership, said: "I reckon he did, he paid taxes on it, and claimed it and cultivated it." Stafford said: "He owned the Crawford survey beginning at twenty four poles still below there as Mr. Sell measured it and ran up to Leander Ellises and then crossed over to the river and down the meanders of the river is the way I understand it. Then he owned over a mile of the Cloyd survey." The Crawford survey was a tract of 248 acres, described in the patent as lying on Guyandotte River at the mouth of War Creek and as beginning at two beeches and a poplar on the bank of the river a small distance below the mouth of War Creek. It did not call for any sugar trees. The Cloyd survey, containing 7,800 acres, is described as beginning at three sugar trees and a beech at the mouth of Peter Huff's Creek, thence with the Guyan-

dotte River to three sugar trees 20 poles below the mouth of
Kettle Creek and corner of Wilson C. Nicholas' survey of
500,000 acres, thence N 10 E to a line of the Austin Nicho-
las' survey on the bank of Peter Huff's Creek, thence down
the creek to the place of beginning. This survey was
made, not by James Taylor, assistant of Robert Adams,
Surveyer of Wythe county, but by W. Taylor, an assistant
of the same surveyor. It calls for a corner of the 500,000
acre tract at the mouth of Kettle Creek, describing it other-
wise as it is designated in the Nicholas patent, but there is
evidence tending to show that Gilbert's Creek was once known
as Kettle Creek. As owner of the Crawford tract, he
was not the owner of adjacent land, as determined by the
calls of the title papers. He had no interest in the Morris
grant and was not a claimant under it. Unless, therefore,
he was the owner of part of the Cloyd land, within the
meaning of the rule admitting declarations of deceased ad-
jacent owners, the declaration cannot be admitted as such.
If the Cloyd patent had been offered in evidence to
identify the three sugar trees as the corner of the Morris
grant, it could not have been received under the rule laid
down in *Mullin* v. *Lewis*, 5 W. Va. 144, following *Over-
ton's Heirs* v. *Davison*, 1 Grat. 211, and *Clements* v. *Kyles*,
13 Grat. 468, because the survey for the Cloyd grant was
not made by the surveyor who ran the lines of the Mor-
ris grant. The court could not say, from the face of
these grants and surveys, that the Cloyd tract was an ad-
jacent tract. although it calls for a corner of the Morris
tract. Neither Spratt nor Cloyd was a predecessor in title
to King. Neither ever owned or claimed under the Morris
title. And their declarations could not be given in evi-
dence as admissions to be taken against a claimant under
the Morris title. We do not understand, however, that the
evidence was offered for this purpose. It was introduced to
prove the declaration of a deceased owner of an adjoining
tract. Though Isaac Spratt does not appear to have had
paper title to any portion of the Cloyd survey, we do not
perceive any reason in this, notwithstanding the contrary
opinion of Judge Paull, for rejecting the testimony. There
is evidence, independent of the calls in the two patents,
tending to show that the Morris and Cloyd surveys are

adjacent, if the Morris line is properly located as crossing the Sandy River at the mouth of Turkey Creek and the Guyandotte River at the mouth of Gilbert's Creek. It is proven that Spratt lived upon a portion of that survey, claiming and cultivating it at the time of the alleged declaration. The rule admitting such testimony declared in *Harriman* v. *Brown*, 8 Leigh 697, includes not only owners but tenants of adjacent tracts. As there stated, it says: "Evidence is admissible to prove declarations as to the identity of a particular corner, tree, or boundary made by a person who is dead, and who had peculiar means of knowing the fact; as, for instance, the surveyor or chain carrier upon the original survey, or the owner of the tract, or of an adjoining tract calling for the same boundary, and also tenants, processioners, and others, whose interst or duty would lead them to diligent inquiry or accurate information as to the fact, always excluding those declarations which are liable to the suspicion of bias from interest." Spratt was at least a tenant of part of the Cloyd survey. Judge Paull, in excluding the evidence of these declarations laid stress upon the lack of an entry, survey, patent or deed calling for the three sugar trees. The Cloyd patent, though not admissible under the rule we have stated for the purpose of identifying this corner, may be shown by other evidence to coincide with this corner of the Morris tract. It constitutes paper title under which Spratt was in possession and makes his declaration competent as that of a tenant at least of an adjoining tract. However, the declaration was not to the effect that the three sugar trees were known by the declarant to be the corner of the Cloyd survey of which he was a tenant. He had no peculiar interest in ascertaining the boundaries of the Morris grant under which he did not claim. In view of this, we do not think the evidence admissible as the declaration of an adjacent owner. The rule admitting such evidence is based upon the assumption that the declarant had an interest peculiar to himself and his own land which induced him to ascertain the boundaries of his own tract. These witnesses say the trees in question were not recognized by Spratt as a corner of his land. He had cleared the land around them and the trees had been cut down. But the

declaration seems to be admissible under the rule admitting evidence, not of declarations as to particular facts, but of reputation. The distinction is plainly marked in the decisions, and is perhaps better stated in *Hunnicutt* v. *Peyton*, 102 U. S. 333, 364, than elsewhere. In that case, Mr. Justice Strong said: "We will not undertake to review the vast number of decisions of state courts upon this subject. It would greatly protract this opinion. Some things may be deduced from them, which, though not universally recognized, are the conclusions to which, we think, a great majority of them lead. In questions of private boundary, declarations of particular facts, as distinguished from reputation, made by deceased persons, are not admissible unless they were made by persons who, it is shown, had knowledge of that whereof they spoke, and who were on the land or in possession of it when the declarations were made." In *Cline* v. *Catron*, 22 Grat. 378, as well as in *High* v. *Pancake*, 42 W. Va. 602, family tradition and reputation are held to be admissible in evidence on the questions of boundary, but not to prove-title. Of course such evidence is not entitled to the same weight as admissions of owners or testimony by adjacent owners to particular facts. It is more uncertain and remote in its nature, but it is admissible.

Other evidence strenuously objected to consists of certain plats made in accordance with the contention of the contesting defendants by Harmon, Reynolds and Mathews, founded upon surveys made by them, respectively, in 1847, 1884 and 1886. The Harmon survey seems to have been made some time after the conveyance by Dumas to Thornfeld and by Thornfeld to Maupertius and Serricourt, trustees of the Virginia Company of Guyandotte, organized for the purpose of taking over 300,000 acres of land and colonizing it. The representatives of this company, some time between 1840 and 1850, came to Virginia to locate the land, but had difficulty in finding it. Harmon made a report of his survey May 7, 1847, but to whom it does not appear. This report says it was made pursuant to a contract between Harmon and Louis Chitti, Esq., and in the brief of counsel for the appellant it is said that Chitti was an attorney in fact for

Dumas. Among the papers in a lot of consolidated suits in the circuit court of Kanawha county, for the settlement of the Swan estate, to which all these French claimants seem to have been parties, and known as the French suits, the Harmon plat was found and is exhibited in this record. Randall, trustee, caused the Reynolds survey to be made. After this, Randall conveyed to Samuel Baugh 1,000 acres, to C. F. Smith and R. J. Fougeray 13,000 acres and to Christian F. Smith, trustee, 3,000 acres, describing the tracts as so many acres of contiguous land that the parties might survey and lay out from what was known as the Swan 500,000 acre tract and then set out the metes and bounds of said tract as they are described in the patent. Later a survey was made by Mathews under an order of court for the purpose of enabling it to cause conveyances to be made to Baugh and Smith, trustee, and Smith, and Fougeray. Mathews made a report of this survey, accompanied by a map, which was returned to and filed in the case. Reed, trustee, the successor of Randall, afterwards filed a petition in the French suits, praying permission to sell the Swan lands, in which he said that, so far as could be ascertained, there were only 80,000 acres of the land in West Virginia. Randall had previously resisted payment of taxes on a large area, as disclosed by the record in *McClure* v. *Maupertius*, 29 W. Va. 633, on the ground that part of the land had been taxed and the taxes paid in another county, and so effected a redemption by the payment of $8,000.00, while the commissioner to whom the cause was referred had reported the amount due as being about $122,000.00, exclusive of interest. It seems that one of the lines of the Smith and Fougeray 13,000 acre tract, as designated in the deed, not from Randall, trustee, but from the commissioner appointed to make the conveyance after the tract had been selected by the purchasers, coincides with the western line of the Morris tract as surveyed by Harmon, Reynolds and Mathews from the Gilberts Creek corner to the mouth of Turkey Creek. E. L. Buttrick, attorney for John R. Reed, trustee, some years ago, wrote a letter to W. E. Chilton, claimant or owner of a tract of land lying outside of the Morris tract, as surveyed by Reynolds, telling him that his land was not within the

Morris survey, which was used by said Chilton in effecting a sale of his lands. These circumstances are relied upon as evidence of admission on the part of King's predecessors in title that the quantity, location and boundaries of the Morris grant are correctly given in the surveys made by Harmon, Reynolds and Mathews. The Harmon map was rejected by the trial court in the case of *King* v. *Watkins*, the court saying it did not constitute an estoppel in favor of Watkins and was not evidence of an admission. That these surveys present none of the elements of estoppel is, in our opinion, perfectly clear. The trial court in *King* v. *Watkins*, said: "The written statements of Harmon do not fall within the principle just stated. (the rule hereinbefore quoted in *Harriman* v. *Brown*.) He was not the surveyor or chain carrier in making the original survey, he was not the owner of this tract nor of an adjoining tract, nor had he any interest in the land which rendered his declarations admissible as proof of any corner or boundary line. It should be remembered that this kind of evidence, which is hearsay, is only admitted from the necessity of the case. It is admitted where no better evidence can be had. So far as the evidence has been developed in this case, the parties interested have as good opportunities to make surveys of the lands in controversy for the purpose of ascertaining the true boundaries of the same as Harmon had." This ruling was not passed upon in the appellate court. There is no doubt that the admission of a former owner, dead or alive, may be given in evidence against his successor. *Stewart* v. *Doak Bros.*, 58 W. Va. 172. There seems to be no good reason why evidence of such admission should be limited to verbal statements. Admissions by conduct would seem to be of equal, if not greater, weight and admissions in writing are generally regarded as more solemn than those verbally made. But the difficulty here is to find the connecting link between the predecessors of King and these surveys. That they sent out surveyors and caused explorations to be made for the purpose of locating the land is hardly enough. It seems to us necessary to go further and show that they accepted these surveys as being correct. In the French suits in which the maps were filed, many interests were involved. There were

trustees and *cestuis que trustent*, representatives of legal titles and equitable titles and creditors. By whom all these plats were brought in or for what particular purpose, is not disclosed. Contemporaneous with all these proceedings, the trustees and other interested parties seem to have held to the description found in the patent, rather than the lines laid down on the maps. In the case in which the Harmon plat was filed a decree was entered twelve years later by which Maupertius was adjudged to be the owner of 300,-000 acres of the 500,000 acre tract, subject to a lien for purchase money, and the Swan trustees of the remaining 200,-000 acres. In 1859, Randall, trustee, brought an action of ejectment for the whole 500,000 acres against Evermont Ward and others in the federal court and made defendant thereto persons residing in and claiming land many miles west of the boundary as located by Harmon, including some living at Logan Court House. In 1869, Maupertius entered 300,000 acres and Randall 200,000 acres on the land books for taxation and the former paid taxes on his 300,000 acres up to 1875. Sometime in the 50's, Harmon, at the instance of somebody, ran the survey to the mouth of Island Creek, following the calls of the patent by course and distance as nearly as he could. In 1873, Anthony Lawson, a claimant by purchase at judicial sale, had 375,000 acres entered upon the land books, charged with back taxes to 1865 and paid the same.

All that can be found in the record in any way indicative of an express adoption of these surveys is the recognition of the Harmon line in the deeds made to Fougeray and Smith and the representation made by Buttrick, as attorney for Reed, trustee. Buttrick wrote the letter to Chilton and seems to have used the Reynolds map in connection with that and perhaps other transactions. But it is said that Fougeray and Smith, knowing the controversy over the location of the boundary line, surveyed their own lands so as to be within the Morris grant in any event. They had the right to select from the entire boundary their tract of 13,000 acres. They did so and adopted the Harmon line and a commissioner of the court made a deed accordingly. We do not see how this can be regarded as an adoption of the Harmon survey by Reed, trustee, for any purpose.

As to the representations made by Buttrick, it suffices to say that he was only the attorney of the legal owner of the land, having no authority or power to bind his client by a disclaimer of any character. *Forest Coal Co.* v. *Doolittle,* 54 W. Va. 210. Nor can an attorney, without express authority, compromise or release a claim of his client. *Smith* v. *Lamberts,* 7 Grat. 138; *Wilkinsan* v. *Holloway,* 7 Leigh 277; *Crotty* v. *Eagle,* 35 W. Va. 143; *Kent* v. *Chapman,* 18 W. Va. 485. It does not appear that Reed ever ratified this action on the part of his attorney. Taking these plats and surveys in connection with all the other conduct of King's predecessors in title, we do not see that they constitute any evidence of an admission. A long course of litigation in which they had been used, with the knowledge of the trustees, unaccompanied by any conduct evincing intention to the contrary, might have made them evidence of an admission. But we do not find it so. Recognition of them at all is only an uncertain inference, while the predecessors of King have steadfastly held to their claim to the quantity of land called for by the patent and persistent in describing it according to the original calls, besides paying taxes on it and otherwise treating it as a 500,000 acre tract.

Many decisions, cited in resistance of this conclusion by counsel for the appellees, were rendered in *caveat* cases, in which the issue was the location of boundary lines designated in entries and surveys, before any patent issued, and while the whole matter was *in fieri.* Such cases involve the settlement of the boundary line in anticipation of, and by way of preparation for, the issuance of the patent, and before title has passed or been acquired. There is much more latitude in such cases for holding parties bound by their conduct. After the patent has issued, vesting title, it is no longer a question of location in the sense of selecting land or determining where the party wants the lines to run, or what is equitable and just between conflicting entries and surveys, but the mere ascertainment of the lines called for in the patent, and, as a general rule, if they are capable of certain ascertainment and location upon the ground, they cannot be varied or departed from or overcome or set aside by mere conduct.

Many decisions are cited also for the position that King, by reason of his knowledge of the surveys made and the conduct of his predecessors in title, is estopped in favor of the defendants claiming under other hostile titles, on the theory of acquiescence. Acquiescence to fix boundary lines, as declared by this Court in *Gwynn* v. *Schwartz*, 32 W. Va. 487, requires more than mere representations. It must be in the nature of an agreement upon a line. The line must be recognized by acts done upon the ground with the knowledge of both parties. The rule, as stated in *Gwynn* v. *Schwartz*, is as follows: "Long acquiescence by one adjoining proprietor in a boundary established by the other is evidence of such agreement so fixing the division-line between them. Such acquiescence may be shown by the the adjoining land owners, having actual possession and cultivating to such line; or, if the line run through the woods, by the proprietor, who established such division-line, with the knowledge of the adjoining land-proprietor always clearing up to this line and, with his like knowledge cutting timber and peeling bark up to this division, the other land-owner making no objection to such claim or such acts of ownership, though he was present when such acts were being done." The conduct on King's part, relied upon as acquiescence, does not consist of acts done upon the land, such as clearing up to a line or cutting timber to a line or holding up to any particular line by his tenants or otherwise, but of representation on paper in judicial proceedings and otherwise. Nor does it appear that the Gilbert's Creek and Turkey Creek line has been recognized in any such manner by the contesting defendants. They have settled all over the Morris tract, without reference to boundary lines.

From the evidence bearing on the location of the boundaries, it seems difficult to say whether the calls for monuments or the calls for courses and distances were random, or merely conjectural. Taylor's surveys all fell short in quantity and the length of the lines and the courses were found to be very inaccurate. Other surveys fell almost as far short as this one, and the courses and distances had to be largely ignored. These inaccuracies afford ground for the belief that he did not chain the lines from monu-

ment to monument or follow the course indicated by the needle, as he went through the wilderness. He may have gone to a well known point, marked a corner there, set up his compass so as to indicate the supposed direction of another, partially chained or estimated the distance, and, on reaching it, repeated the operation. Instead of chaining, across the mountain tops and deep ravines, he may have followed the meanders of the ridges or streams between points. If this was his method, and there is evidence tending more or less to prove it, his surveys would necessarily be utterly unreliable, in respect to courses and distances, but accurate as to monuments. The difficulty of making an accurate survey by courses and distances, under the conditions obtaining in that country at the time this survey was made, were very great. It was a rough heavily timbered country, making it hard to see between stations, distant from each other, and slow and irksome to chain directly from station to station; but it was comparatively easy to select accessible points for corners, and practically guess at the courses and distances. To this we must add the circumstances that there was then a mad rush of speculators into this region for land at two cents an acre, and consequent pressure upon the surveyors, well calculated to induce resort to the easiest and quickest method of achieving results. The experience of surveyors who have located, or attempted to locate other surveys of Taylor, and the facts ascertained and revealed by them, argue strongly that some such practice was adopted by him.

In view of this, it is important to note the circumstances bearing on the probability that the two points from which the lines were located by Harmon, Reynolds, Mathews and the court below, are called for in the patent. The patent says the second line ended on the waters of Knox Creek. If so, it was impossible to have run due north and crossed the Sandy River at Thackers Creek. Nor could it have crossed Knox Creek in so doing. It would have gone far to the west of it. It might have crossed at or near Beech Creek, but in that case, it would have gone directly down Knox Creek, and, after crossing the Sandy River, Pigeon Creek and dividing ridges, down the Island Creek Basin, crossing numerous branches, some of which

would no doubt have been mentioned. The mention of the creek at which it crossed the Sandy River may be justly regarded as an incidental, rather than a locative call. No marked trees or other objects, exactly locating the line are mentioned. The call for a corner is at the Guyandotte River below the mouth of a creek which this line crosses twice before reaching the terminus. Gilberts Creek answers this description perfectly. No other creek does, and the third line, run by way of Beech Creek or Thacker's Creek, would never reach the Guyandotte River within the distance called for; nor, if run so as to cross the Sandy River at the mouth of any creek other than Turkey Creek, would it reach the Guyandotte River, within the distance, at the mouth of any creek, emptying into it on the south side, if the maps filed locate the streams accurately. That river is one of the most important objects mentioned, and best calculated to challenge the attention of the surveyor. Refutation of this line of argument is sought in the fact that Turkey Creek flows into the river from the east, so that, after crossing the river, the line could not have gone up the creek, as it is described, nor up the north fork thereof. From this, it is argued that Taylor could not have been at this point and noted the course by his compass; but we have already said this call is incidental. It marks no stopping place, not being a corner or terminus of the line.

That Taylor did not know the country, nor the names, locations and relative positions of the streams, or knowing them, relied on his recollection in drafting the erroneous plat, returned with his survey, constitute the shibboleth of the argument against the actuality of the survey. A plat of a survey, made by him for Kettera, about six months after he had surveyed the Morris tract, shows that the more important streams had then acquired the names they bear now. It shows that what are now known as Island Creek and Mate Creek bore the same names then. Horse Pen Fork of Gilberts Creek was designated "Horse Pen Creek" on it, and the relation it bears to Island Creek in respect to position and distance, fairly indicated. Against the use of this Kettera plat, for the purpose of showing the names then applied to the streams and Taylor's knowledge thereof,

the rule in *Mullin* v. *Lewis*, 5 W. Va. 144, and other cases to which reference has been made, is invoked, it appearing that no patent ever issued upon the Kettera survey. Though it cannot be used as evidence to locate the lines and corners of the Morris survey, for the reason stated, we think it is admissible to prove the contemporaneous condition of the country and Taylor's knowledge thereof, although this strengthens the case made for actuality of survey and Taylor's presence at the disputed points. Identification of the corners and lines is not the direct or immediate object or effect of it. We do not locate the Morris grant by the Kettera survey, nor admit the latter for the purpose of fixing any of the corners or lines of the former. The Kettera plat is a part of the history of the locality and the work of James Taylor, closely related in point of time to the survey in question. It is competent to show surrounding conditions and circumstances. If it were introduced in a jury trial, for such purpose, the court could so limit its effect by an instruction. There are many instances in which evidence is admitted for partial or particular purposes and not for all. That such evidence incidentally or resultantly strengthens the case in other respects, constitutes no objection to its admissibility. If it had no bearing on the real issue, it would be irrelevant and inadmissible. That it tends to the decision of the issue constitutes the reason or basis for its admissibility. When the streams acquired their present names and Taylor's knowledge of the country are subsidiary issues, bearing on the primary issues, but minor and subsidiary nevertheless. What evidence ought to be admitted on them? Naturally and logically any that is relevant and material. Shall it be excluded, because not admissible for other purposes? That is not the practice in other cases. That the streams had their present names in 1794 and 1795, and Taylor's knowledge of the fact, though proven, are not decisive of the location of any line or corner. These facts, not the evidence proving them, go in on the general issue merely for what they are worth. That their weight under the circumstances of this case is great, while in others it might be almost imperceptible, constitutes no reason for the exclusion of the evidence in the former and its admission in the latter;

but it proves the line of distinction between the main and the subsidiary issue.

As we have indicated, much. evidence was introduced to prove that Gilberts Creek and Turkey Creek acquired their present names long after the Morris survey and that Island Creek and Thackers Creek were once known, respectively, as Gilberts Creek and Turkey Creek; but, regarding it as true and worthy of credit, it is indefinite as to when these creeks were so named, and whether they bore these names in 1795. On the contrary, Island Creek appears to have been known to James Taylor by its present name only a few months after he made the Morris survey. He also knew a branch of Gilberts Creek then had its present name. These and other salient circumstances disclosed by the evidence preclude us from disturbing the finding of the circuit court on the question of boundary, and except in so far as it purports to take away rights vested in any person by the decree of September 30th, 1897, as modified and partially affirmed by a former decree of this Court, we affirm the decree of December 6, 1905. But it is too broad and must be limited as aforesaid.

The lands of Egbert Mills and others, William J. Canady, Robert White and others, Joseph and Geo. W. Hinchman, Richard Torpin and others, Trustees, W. A. Johnson, A. H. Toler and others, James Hatfield, Bruce McDonald and others, Alexander Varney, Chas. L. Tracey and Elijah Ferrell and others were dismissed as being wholly outside the boundaries of the Morris grant, as fixed by the decree of December 6, 1905. That they are outside of it as so bounded is not questioned. Affirmance of the decree as to the boundary lines necessarily sustains the decrees of dismissal as to these tracts, and we need not further discuss them. Later decrees dismiss as to them under section 6 of chapter 105 of the Code.

All the other dismissals were based upon motions, accompanied by patents and School Land Commissioners' deeds, under section 6 of chapter 105 of the Code, as amended by the act of 1905. These are not complained of otherwise than on the theory of invalidity of sections 3 and 6 of Article XIII of the Constitution, certain provisions of chapter 105 of the Code, and the amendatory Act of 1905. All of

these questions have been dealt with in an elaborate opinion prepared by JUDGE BRANNON, in which we concur, and it is unnecessary to repeat the argument and conclusions here. It is not claimed that any forfeitures, subsequent to the making of these deeds, were proven, or contended that the titles under the deed and patents are not good and superior, justifying dismissal, if the constitutional and statutory provisions, referred to, are valid.

It results from the views and conclusions, herein stated, that the decrees of dismissal, complained of, must be affirmed.

*Affirmed.*

BRANNON, JUDGE:

King insists that the Act of 1905 invades, in fact, destroys vital rights vested in him before its passage. He says that it divests vested rights of property, and impairs the obligation of his contract, and deprives him of property without due process of law, and is a violation of both federal and state constitutions because it does so. His theory is that when he filed his petition asking the privilege of redeeming the land from forfeiture for non-entry on the tax books, and when it was declared by the decree of September 30, 1897, that he had superior right to redeem over all others, section 17, chapter 105, of the Code, as that chapter was re-enacted February 23, 1893, gave him the right of redemption, and such right was by that decree adjudged to be vested in him. The claim is that the Act of 1905 retroacts and infringes upon such rights antecedently existing. It becomes thus material to see what rights were in King under the Act of 1893; to see under what conditions or restrictions they were placed by that act, to enable us to say whether the Act of 1905 lessened King's rights. The decrees complained of in this appeal dismissed the suit as to certain tracts and thus denied King's right to redeem those tracts, and thus lost title as to them to him. This was done because the persons owning these tracts showed facts giving them a transfer of the state title under forfeiture by force of section 3, Article XIII, of the Constitution, or because they claimed under sales made by the state in suits to sell forfeited land brought under chapter 105

of the Code. There can be no question that forfeited lands so transferred to other claimants are protected from sale by that section of the constitution. Nor can there be question that lands once sold by the state as forfeited in her suits are protected from second sale. *State* v. *Jackson*, 56 W. Va. 558. Being exempt from second sale, so are they exempt from redemption by the former owner, since where the state has no title to sell she has none for redemption. Why can she then neither sell nor allow redemption? For the simple reason that by such transfer under the Constitution or by such court sales her title has passed from her to those persons designated in the constitution as taking title by transfer, or those persons purchasing under court sales. Those persons named in the constitution holding papers or possession and having paid taxes have the state's grant, as those who have deeds under such court sales have also the state's grant, passing in both cases the state right. The constitution makes a grant; the statute in cases of court sales makes grants by deeds made under them. *State* v. *Jackson*, 56 W. Va. 558; *State* v. *Harmon*, 57 *Id.* p. 461; *Strother* v. *Lucas*, 12 Peters 410. Those state cases hold that such lands cannot be sold or redeemed. The statute of 1893, clearly prohibits their sale. Section 6, after providing for a suit to sell the land for the benefit of the school fund, contains the following provision prohibiting their sale, and commanding the court to dismiss tracts so circumstanced without waiting for a full decision of the case as to other lands: "And if at any time during the pendency of any such suit, it shall appear to the court that any part of any tract of land in question therein has been sold by the state in any proceedings for the sale of school lands, and the taxes regularly paid thereon since such sale, or is held by any person under section three of article thirteen of the constitution of this state, the bill, as to such part, shall be dismissed, and the suit proceeded with to a final decree as to the remainder." That was the law when King first asked redemption. Section 15 says that a deed under a court sale of forfeited land shall pass all title vested in the state by forfeiture or otherwise, so far as it remained in the state at the date of the decree of sale; that is to say, that if it had already been sold or transferred to junior claimants

even a sale would pass nothing, thus again showing care
not to impair titles already so transferred. The very sec-
tion under which King sought redemption, seventeen, says
that a former owner may ask redemption of "so much *only*
of such real estate as to which the title still remains in
the state." If it has been already transferred by the con-
stitution or court sale to another, no redemption could be
allowed. And to show the most intense purpose to pro-
tect title which has so passed from the state, that same
section gives the legal effect of redemption in telling the
court that its decree must declare redemption "so far only
as the title thereto is in the state, as provided in this
chapter," and that the decree shall operate as a release of the
forfeiture "to the extent declared therein." The section
adds that the redemption shall vest in the former owner "no
other title to the lands redeemed than was vested in him im-
mediately before such forfeiture," and qualifies that scope
of the release by the strong language, "but such redemption
shall in nowise affect or impair any right, title or interest any
other person may have in said real estate or any part
thereof, by *purchase from the state*, or under and by virtue
of section three, article thirteen of the constitution of this
state." Notice that this protects not only those mentioned
in the constitution, but also those having right, title or in-
terest by "*purchase from the state*," plainly saving from
the effect of redemption, even after it is made, if the
court erroneously allows it, instead of dismissing the case
as to such land, land purchased at a court sale of forfeited
land. The last clause of section 20, after giving the effect
of a sale, guards such transferrees or purchasers by saying
that the sale shall have a certain effect "except as pro-
vided by the last clause of section 17," that clause just
above quoted. Section 19 of the Act of 1893 validates
prior court sales of school land. It says that any such
prior court sale under chapter 105 of land as forfeited, es-
cheated or waste, shall confer on the purchaser all title of
the state, whether it came by forfeiture, escheat or as
waste and unappropriated land, and confirms all such sales
and deeds made prior to the act to pass all the state's
title. It provides like effect for future sales. It is incon-
testible that King's right of redemption was subject to all

the conditions, restrictions or limitations above specified found in the Act of 1893. How possibly can King assert that redemption under the Act of 1893 would recall his forfeited title from purchasers under court sales or transferrees under the constitution? Why allow an abortive redemption? If before actual redemption his forfeited title had been sold under decree, he could not by redemption reinvest himself with it. *State* v. *Jackson*, 56 W. Va. 558. If it had been transferred to another by the constitution, he could not do so. If the state, before redemption, had sold land covering his land under any other title than his, or it had been forfeited under any other title and transferred under the constitution, all title of the state, including King's forfeited title, would go to the purchaser or transferree, and he could not redeem it, because all state title would vest in the purchaser at a court sale or transferree under the constitution; and this because section 15 of the Act of 1893 says that the deed under a court sale shall pass "all the right, title and interest of the state in and to the estate thereby conveyed which passed to and vested in the state, under the constitution and laws thereof by reason of the forfeiture of such real estate or otherwise which remained in the state at the time of the decree for the sale thereof, regardless of whether the same was sold and purchased as forfeited, or waste and unappropriated land." And furthermore, section 19, as stated above, passes by the sale all state title, no matter how emanating. A sale of forfeited land by old forfeiture acts under one title passes the title of the state acquired by forfeiture of any other title. *Smith* v. *Chapman*, 10 Grat. 445; *Bowman* v. *Dewing*, 37 W. Va. 117. For stronger reasons under our statute law above referred to. *State* v. *Jackson*, 56 W. Va. 558. And where there had been no court sale, the constitution, section 3, Article XIII passes to the person designated there "all title" of the state, no matter under what or how many different titles. I repeat, that if by court sale or transfer under the constitution the King title has gone from the state, it cannot be either sold or redeemed, tested by the Act of 1893, regardless of the Act of 1905, which is but the same. If so, passed from the state, and we could call a right to redeem a property right, there is

no property right in King taken from him by the Act of
1905; none in him to be taken away. For a like reason
there was no contract to be impaired. To say there is a
·contract there must be a property right or thing of value,
·a subsisting one, to be its subject or basis, as said by Chief
·Justice Marshall, as found in *Railroad* v. *Transp. Co.*, 25
W. Va. p. 354. In the close of the eighteenth and the
·opening of the nineteenth centuries speculators took from
Virginia by patent a vast area in large tracts of her wilder-
ness domain, to hold for baronial estates or fortune at nom-
inal cost. They paid no taxes, nor did they themselves oc-
·cupy or sell the lands to settlers, There they lay. Settlers
·could not acquire them because barred out by those titles.
The tax demands were justly payable out of the land, and
Virginia adopted the severe and drastic, but only, remedy,
*forfeiture.* A vast quantity of wild land thus came back to her.
To get revenue and· settle the country she sub-divided it and
·sold under decrees much of this land through an officer called
·the commissioner of delinquent and forfeited lands. She
gave some of it by legislative transfer to those holding
junior grants. When by court sale she sold the forfeited
land, under one title, she gave the purchaser that title as
also any right she held by forfeiture of any other title as
above stated. *Smith* v. *Chapman*, 10 Grat. 445. She is-
·sued patents for some of these lands. By sale and patents
·she sought to sell these forfeited lands for revenue and
the improvement of the country. West Virginia inherited
from Virginia a great quantity of this forfeited land, and
some which never had been granted out, called waste ‚and
unappropriated land. Her first constitution stopped the entry
·and grant as a process of disposition of her lands, and re-
·quired their sale, and the Code of 1868, chapter. 105, pro-
vides for their sale, " so far as the title thereof shall not be
·vested in junior grantees or claimants as provided in chap-
ter 31." (It thus denied power to sell to their hurt.)
'Owners of land continued, after 1831, to leave their lands
·off the books for taxation, and by act of March 4, 1869,
·owners of land were required to cause their lands to be
put on the tax books and charged with back taxes to
1832, and in the future after the passage of the act, and
·declaring an absolute forfeiture for omission for five suc-

cessive years. This act in section 9 gave away the state title to certain persons holding under grant from Virginia. or this state. Later the constitution of 1872, Article XIII. section 6, continued to impose forfeiture for the failure of owners to put their lands on the books, and transferred as a gift all state title, however derived, to certain persons claiming under junior grants or color of title and other circumstances stated in section 3, Article XIII. I have stated how the Act of 1893 carefully protected junior claimants under the constitution, and under court sales from sale in suits to sell forfeited land. The constitution of 1872, Article XIII. section 4, commanded that all lands owned by the state by forfeiture or otherwise should be sold by suit in a circuit court; but it was careful to say that only such land as had not been redeemed, released, transferred or otherwise. disposed of should be so sold; it provided that there should be sold only land, "the title thereto shall remain in this state until such sale." If before the sale it had been already redeemed, "transferred or otherwise disposed of," it could not be sold. That provision plainly protects junior claimants under the constitution and purchasers at court sales. Here is a constitutional provision on which the whole legislation for the sale of state land is based—its very source—providing that no sale shall be made where the state right has passed already to another by any of the processes prescribed by law. How clear the intent to prevent the state from again disposing of such land by sale, and to give peace and safety to the people in their homes. The first legislature under that constitution by act excepted from sale all land that had already been disposed of. Its first section authorized the sale only of land" the title thereof shall not be vested in junior grantees or claimants under the provision of the constitution and laws." Its 9th section says that "no land shall be sold under the provisions of this chapter," if they be lands of persons to whom the state title was transferred by section 3, Article XIII. of the Constitution. And its section 13 allowed redemption before sale, but provided that it should not affect or impair the title transferred to any person as provided in section 3, Article XIII. of the Constitution. Acts 1872-3, chapter 134. The Act of 1882, re-enacting chapter 105 of the Code,

directs the sale, in section 1, of state lands "so far as the title thereof shall not be vested in junior grantees or claimants under the provisions of the constitution and laws of this state." In section 14 it is provided that redemption shall in no way affect or impair the title of land transferred to other persons by the constitution. Next in time comes chapter 94, Acts of 1891. It again, in section 1, provides for a sale of state land, but only of lands "so far as the title thereof shall not be vested in junior grantees or claimants under the provisions of the constitution and laws of this state." In section 17 it is provided that a decree of redemption shall declare that it goes "so far as the title thereto is in the state immediately before the entering of the decree." The court could enter no decree of redemption affecting anybody's right but that of the state. I have gone through this tedious resume or review of the laws of Virginia, and especially West Virginia, for many years back for the purpose of showing that the anxious care of the state has always been to save to the junior claimants, above referred to, their rights, to forfeit the titles of delinquent owners and pass them to those specified in section 3, Article XIII. of the Constitution, and those purchasing in good faith of the state at her open sales under decree of her courts. The state knew of the vast complications of title. She knew of the incubus upon state and people created by these old lordly estates, and she adopted means of forfeiture and passing her right to others that she might have her taxes for support of government, and cause the wilderness to bloom by the settlement of the country, and to give peace and composure to the pillows of her people. She did not intend by either sale or redemption to breathe new life into these buried titles to afflict her people. Her every act of legislation upon the subject declares this intent. In my own opinion that was a disastrous day when the legislature passed an act allowing redemption of forfeited lands. Grants and sales of them had been made in full faith that they were dead and buried. Redemption called them back again to becloud these junior titles and be a Pandora's box of litigation and strife. The constitution does not give any right of redemption. It was born only of the statute. The legislature, in grace and mercy, gave this right of redemption;

but never did it intend to harm those who had taken grants from the state or purchased under her decrees. She tied her own hands from re-sale to affect them, and she certainly did not intend to give a redemption to affect them. She preferred younger claimants settling the country and paying taxes.

Above I have sought to show, to repeat, the limitations or restrictions imposed upon King's right of redemption by the law in force under the Act of 1893 when he sought redemption. It now becomes material to see wherein the right of redemption of King has been worsted by the Act of 1905. Acts 1905, chapter 42; the Code published in 1906, sections 3518 and 3531. There we find that, "Any tract or parcel of land which has been heretofore forfeited, or treated as forfeited, waste and unappropriated or escheated, and which has been sold and conveyed as such under chapter 105 of the Code, or other act since 1872, or which any instrument executed under such decree or order purports to convey, shall not again be proceeded against or sold in any suit now pending or hereafter brought," unless since such conveyance or instrument the tract or parcel has itself been forfeited. I do not see how this deprives King of any right which he had before the act, or imposes any restriction on redemption not before upon it. It says that such land shall not be sold a second time. The old law said the same. Another clause says the court shall have no jurisdiction, power or authority to either sell or allow redemption of such a tract before sold, unless the state or other claimant allege and prove that such tract itself has become forfeited. This, so far as resale is concerned, only reiterates or emphasizes for care that there shall be no second sale of such tract, unless it too is forfeited. Of what importance is the feature taking away jurisdiction to sell? It does not mean that the court is without color of jurisdiction in the whole case. It is only another way of saying there shall be no resale, or that if there is resale, it shall be void, or that upon its appearing that the land has been once sold, the court shall stop and dismiss the tract from the case. King is not by this clause harmed, if in fact his title had been forfeited and it had gone to a purchaser under such sale. That was the law by the Act of 1893. That said that

if forfeited and it had been transferred or sold to other persons, he could not redeem.    This clause did not make his title more dead or extinct and beyond redemption than it, already was under the old law.

The act says there shall be no new sale or redemption to the prejudice of any other grant, survey, piece or boundary of land which has been or is claimed to be forfeited, unless the state or claimant proves by a certificate 'of the auditor or clerk of the county court that such tract or parcel has, since the date of the conveyance under such former sale, been forfeited and so remained, and that in the absence of such allegation and proof the court shall have no jurisdiction either to sell or allow redemption against such other grant, survey, piece or boundary of land.    I suppose that though such tract has been once sold, yet if it has been since forfeited, the state could sell it again or allow some other claimant, as King, to redeem, and that such sale would pass all forfeited title, and that such redemption would give back the title of the redemptioner and also the title of the one who had purchased at a court sale. This may be so.    This feature of the statute takes from King no right.    After the statute has declared that there shall be no second sale; after the purchaser at the court sale has proven his right, he has shown a right to protection, and if the party asking to redeem, and whose right to redeem has apparently been lost by the sale shown by such purchaser, why should it not be the burden of the one asking redemption to prove that the right of such court purchaser has itself become forfeited?    This clause only relates to proof, to evidence.    It takes away from King no right which he had before.    The sale had already taken away the right of redemption by the old law, and if he wishes to say that such sale would not debar redemption, he must prove it by showing that the right of his adversary has itself perished by forfeiture.    The Legislature can, without infraction of the constitution, direct evidence, change the rules of evidence, fix the burden of proof, even as to preexisting contracts and rights, provided it does not destroy the contract or right.    Cooley's Constitutional Limitations, 286, 288, 361.    "The right to have one's controversies determined by existing rules of evidence is not a vested right."

Cooley's Con. Lim., 367. Cooley says these rules go to rem-
edy and do not constitute a part of the contract, and cannot
be regarded as of the essence of any right which a party
may enforce. *Dequasie* v. *Harris*, 16 W. Va. 345. "There
is no vested right in a rule of evidence, and as such rules
only affect the remedy, it is within the constitutional power
of the Legislature to modify them." 6 Amer. & Eng. Ency.
L. 950. See cases cited in *Marx* v. *Hawthorn*, 148 U. S.
p. 181. See *Bank* v. *Putnam*, 86 Am. St. R. 372
and note. That the legislature can fix the burden
is clear. See *State* v. *Thomas*, 113 Am. St. R. 17 and note,
and full note 36 *Id.* 682. You see King's right of redemption
was already lost by the sale. The statute denied his re-
demption, as the statute was when his right arose. By the
old law when the purchaser at the court sale produced his
deed that repelled redemption. He could not redeem his
old title. And even if the younger title were forfeited,
he could not redeem and get it back by redemption, because
section 17, in chapter 24, Acts 1893, declares that redemp-
tion shall give the redemptioner no other title to the land
redeemed than was invested in him before forfeiture in his
name. As stated in *State* v. *Jackson*, 56 W. Va. 558, 570, sec-
tion 19, chapter 94, Acts 1891, by retroaction, conferred on
the redeemer all state title; but that retroactive feature is not
found in section 19 as re-enacted by chapter 24, Acts 1893.
When the younger title was forfeited a different title from
the old one was forfeited. The sale created a new title. It
was a new grant from the state, and like a tax deed is an-
other title. It ended the former title. It was no longer
the King title, and he could only redeem the same title
which once was his, but was lost by forfeiture. He would
have no right to redeem that new title. The owner of
that new title would have right to redeem, but he would
not. *State* v. *Harmon*, 57 W. Va. 447, point 7. So, King
could not, before the Act of 1905, to get redemption, show
the forfeiture of the title acquired by the purchaser under
a court sale and get that title also. He cannot say that he
would have the burden of proof of forfeiture, for no proof
thereof would give him right to redeem. And if it would,
he would bear the burden of proof as an answer to the bar
of redemption made by evidence of the court sale. So,

King cannot complain of the Act of 1905 demanding of him proof of the forfeiture of the younger title. The fact is, that it may be that this new act of 1905 gives what he did not have before, that is, right to redeem if the second title was forfeited. Certainly it gave him the right to redeem his own former title in that case, and it may give redemption the force to pass to him the younger forfeited title. It is not necessary to say as to this latter point. The act as to the burden of proof does not even change the former law. The act of 1905 provides that in the absence of allegation and proof of forfeiture of the younger title, the court shall have no jurisdiction to sell or allow redemption; that is, it cannot sell or redeem. That is only a further provision as to the same burden of proof. The act next says that after the junior claimant has filed his conveyance or instrument giving him right under a court sale, the court, in the absence of allegation and proof by the state filed within thirty days, shall dismiss the suit as to the tract claimed by the purchaser under his court purchase. King complains of this thirty days clause. He says that it cuts off by an unreasonable limitation his right of proof. We do not think the time is so short as to warrant a court in overthrowing the act as repugnant to the constitution. The time for the production of evidence is within the legislative discretion, and it must be very plain to a court that its limitation is unreasonable to annul the act. To warrant a court in holding an act unconstitutional the breach of the constitution must be very, very clear, as held in many, many decisions. That act requires only a certificate from public offices to show forfeiture. They are easily produced from the auditor and clerk. Witnesses are not required to be produced or evidence hunted up, except an examination in one or the other of these offices. The time would not seem to be unreasonably short under these circumstances. It may be, and I incline to think, that this feature of the act is merely directory. At any rate the court below so treated it and entered an order, on King's motion, giving him five months time to make allegation and proof of forfeiture of the adverse title. He did not do so. But let us suppose that this thirty days clause is an unreasonable limitation, it would not render other provisions of the act void. That clause can be

separated from other enacting clauses, it being simply a dis-
tinct, separate provision, limiting time for the production
of such written evidence. Strike it out and other provis-
ions remain. It is well established that though there be
in a statute a clause unconstitutional, if it is separable from
the balance of the act, it is disregarded and the balance of
the act left intact. *Eckard* v. *State*, 5 W.Va. 515, 3 Encyclo-
pedic Dig. 186; 26 Am. & Eng. Ency. L. 570; *Bank of
Hamilton* v. *Dudley*, 2 Peters 492; *Berry* v. *B. & O. R.
R. Co.*, 20 Am. R. 69; *Railroad Co's.* v. *Schutte*, 103 U. S.
118; Sutherland on Stat. Construc. sec. 169; *Chicago &c, Co.*
v. *Quincey &c. R. Co.*, 41 Am. St. R. 278.

The act of 1905 says that a copy of a conveyance under
a court sale, or of a purporting conveyance from the record,
shall be evidence of the court proceeding. As said above
upon authority this is a legislative provision that a docu-
ment shall be *prima facie*. Such enactments are common,
and constitutional. An instance is found in Code, chapter
31, section 29, making a tax deed *prima facie* evidence of
certain things. *Dequasie* v. *Harris*, 16 W. Va. 345, holds
it valid; and upon eminent authority there found it is
said, "That the Legislature has the constutional power to
change the common law rule of evidence, and to declare that
the tax deed itself shall be received in all courts as *prima
facie* evidence that certain or all the prerequisites
of the common law have been complied with, and
thus shift the *onus probandi* from the purchaser to the
owner, is clear and unquestionable, and has been almost uni-
versally admitted." *Marx* v. *Hawthorn*, 148 U. S. 172, so
holds.

The statute of 1905 authorizes a defendant in a suit to sell
state lands for forfeiture to file letters patent, or copy
thereof, purporting to grant land, and says that if he shall
show that the land therein conveyed is within the land sought
to be sold, the court shall dismiss the suit as to so much of
the land referred to in such letters patent as lies within the
forfeited land sought to be sold, unless within thirty days
the state shall amend her bill and allege and show by cer-
terficates of the auditor or the clerk of the county court that
such tract is forfeited in the name of the grantee in such
letters patent, his heirs, devisees or assigns, or unless some

other claimant shall make such allegation and proof. Now, this does not take away from King any right of redemption. By the former law he would have no right to redeem in such case. The provision only relates to evidence. It only demands that certain evidence of the forfeiture of the tract of the claimant shall be produced. It is well established that the Legislature may direct what evidence shall be required to prove a fact. It may fix the burden of proof. If you say this provision relates to procedure, we answer that the Legislature has power to regulate procedure in the courts. 3 Encyclopedia Digest, 221-2; 26 Am. & Eng. Ency. L. 749. It may change rules of evidence as above stated. 26 Am. & Eng. Ency. L. 749; *Jones Case*, 86 Va. 661; 113 Am. St. R. 17 and note; *Dequasie* v. *Harris*, 16 W. Va. 345.

It is very apparent that this Act of 1905 does not wholly take away King's right of redemption or lessen it as it existed under the Act of 1893. . Let us note that this act does not at all deny King or any party whose land it is sought to sell the right to deny the forfeiture alleged as the basis of sale. Nor does the act deny King's right to contest in any legal manner the right of his adversary. He can show that the patent or deed of his adversary is forged. He can deny that there was a court sale. He can contest the right of his adversary on which he seeks to bar redemption. The act, it is true, says that certain papers when produced shall be evidence sufficient to prevent sale and to cause dismissal of the suit as to controverted land; but it only makes that evidence *prima facie;* it does not make it conclusive evidence, and close the door against evidence to repel it. In short, the act in these respects bears only on evidence and procedure in the court, a matter within the power of the Legislature. King argues that by *State* v. *Jackson*, the junior claimant must prove his right, as if the Act of 1905 changed this. That required him to prove his grant or deed. When produced it has, ought to have, against the state legal effect to pass its right, and if the state right passed, it left nothing to be redeemed. The burden is yet on the claimant to show his title.

I said above that King claims that his right of redemption constituted a contract; that the state by her act offered

redemption; that he accepted the offer and paid money into court in acceptance, that thus a contract was created between the State and King, and vested right of property thus arose in King. In fact, King says that the state offered her title to him at a price to be measured in a certain way, and that this was an offer to sell, and its acceptance by him created a contract to sell the land. This surely cannot be tenable. The state in such case is not a vendor. I need not cite authorities to any extent to prove that when once a forfeiture takes place it transfers the title, the land itself, from the delinquent owner to the state. *Holly River Coal Co.* v. *Howell*, 36 W. Va. 489; *Wyant* v. *Hayes*, 38 *Id.* 681. The one is no longer owner; the state is perfect owner. She can do with it as she pleases. She can sell it; she can retain it. The constitution gives the former owner no right of redemption. Only the statute gives it. The Legislature could repeal or modify or condition this redemption according to its will. The title being in the state for the owner's fault he can have no vested right to redeem. Redemption is only an act of mercy and grace on the part of the state, to be extended where it shall injure no one else claiming under the state, and it is not a vested right in the former owner. *Mateland* v. *McClure*, 24 W. Va. 561; *Wakeman* v. *Thompson*, 32 W. Va. Appendix 5; *Read* v. *Dingess*, 8 C. C. A. 526, 539. To enable King to say that he had a contract with the state we must find that he has a property right, which the so-called right of redemption is not. Chief Justice Marshall said that to be a contract it must respect property or some object of value "and confer rights which may be asserted in a court of justice." Cited in *Railroad Co.* v. *Transportation Co.*, 25 W. Va. p. 354. What right had King which he could enforce against the state? None. Because not only could he not sue the state, but the nature of his right was not contractual. If a state gives a citizen a right to sue it on his contract, that right may be withdrawn. A mere privilege or grace is not a contract. *Maury* v. *Commonwealth*, 92 Va. 310. "It is competent for the Legislature to repeal the act, which, when passed, was a mere gratuity, if while it was in existence no vested rights had been acquired under it." See *Ewell* v. *Daggs*, 108 U. S. p. 150; *Memphis* v. *U. S.*, 57

U. S. 284; *Bank* v. *State of Ark.*, 20 Howard 527. A contract must be mutual. Who would say that when King filed his petition to redeem he could not recant? Could the state sue him for the taxes he proposed to pay in redemption? I venture to say that no one would say that the state could do this. King could withdraw the money which he paid in. The court would surely have allowed it, if it had been asked. That payment does not create a contract. Until actual redemption by an order of a court and payment of money there is no vested right of redemption. From what has been said there is neither a contract nor a vested right of property. This so-called right of property cannot be in the land, because numerous decisions say that the whole estate is in the state, and until it is restored to the former owner by the actual decree of redemption by the court on payment as an accomplished fact, there is no property in the former owner; for that is the only thing that can restore his title. If the Legislature were to repeal the statute allowing redemption pending the proceeding, the redemption would fail, because its sole origin and support is the statute. *Curran* v. *Owens*, 15 W. Va. 208. Inchoate rights under statute are lost by a repeal of the statute before they are perfected, unless saved by express words. *Crawford* v. *Holstead*, 20 Grat. 211. The peremptory laws allow a settler to go on land and improve it, and enter his claim in the land office and on payment get a patent. It was held that no vested right was born of the acceptance of the government offer and settlement, and that Congress could repeal the law and no vested right existed and "the land continued subject to the absolute disposing power of Congress until the settler has made the required proof of settlement and improvement and paid the purchase money." *Frisbie* v. *Whitney*, 9 Wall. 187. *Yosemite Case*, 15 Wall. 77. On these principles the Legislature could by the Act of 1905 make provisions prejudicing the so-called right of King, if the act had effected any existing right.

King adds that the decree of redemption of September 30, 1897, gave vested right. It declared that King had right to redeem, and he paid in a sum of money computed as the sum proper to redeem 10,000 acres as the part of the 327,-

000 acres of the grant in this state not claimed by others, and took a decree declaring all of it in this state redeemed. On appeal this Court reversed the decree because it allowed the redemption of the whole on payment of taxes on 10,-000 acres, and without defining the part redeemed, and reversed the decree "so far as it allowed the appellee, Henry C. King, to redeem the land described in the decree by reason of the payment of $3,090.08, costs, taxes and interest as fixed by the circuit court, and in so far as it ascertains and fixes such costs, taxes and interest, be and the same is wholly set aside, reversed and annulled. And in all other respects the decree is affirmed." This utterly swept away actual redemption, and rendered abortive the payment of the money, and declared it not sufficient, and declared that redemption had not been consummated. It found that consideration for redemption had not been paid. Who will say that King could not have withdrawn his money, and abandoned redemption? Surely, here was no contract, no vested right of property emanating from the decree. The decree adds nothing to King's right. True, it left standing, the naked declaration that King had right to redeem, but no particular land is designated, and the decree required him to specify what lands he wished to redeem, and reserved for the future to declare redemption of specific land. We can hardly say that his right of redemption covers all by the decree. That decree itself protects the rights of those to whom the constitution transferred forfeited title, as it provided that the redemption which it allowed should not do so. And as to purchasers at court sales, section 17, Acts of 1893, declares that a redemption shall not impair the right of either purchasers from the state or transferrees under the constitution. The saving clause in the decree does not protect such purchasers, but section 17, of the Act does, and just as fully limits the decree and protects such purchasers as if they too had been named in the proviso. The decree cannot go beyond the effect given it by the only law authorizing redemption. Surely, the decree made no contract, no vested right of property in King to bind strangers to the record. As to them there is as yet no adjudication of even a right of redemption; nothing of King's to be prejudiced by the Act of 1905.

The Act of 1905 provides that where a person has been in possession under color or claim of title for ten years and paid taxes during five years of such possession, or where a person has had claim to and actual, continuous possession under color of title for five successive years, after 1865 and paid taxes for five years, the court shall dismiss the suit as to such parties. The state owning the land can transfer it on such terms as it pleases without just complaint on the part of the delinquent former owner. His neglect of public duty has vested the land in the state, and it can do with it as it pleases. This is only an intent to favor the actual settler and tax payer. And, moreover, were this not so, is it anything more than was already provided for transfer by section 3, Article XIII. of the Constitution?

That provision of the Act of 1905 that if it appeared to the commissioner of school land that any land proceeded against is not liable to sale for the benefit of the school fund, he shall report the facts and reasons to the court, and if the court approves it, on investigation, it shall dismiss the suit as to such land, is nothing but a repetition of other provisions of the statute already discussed. It is only another declaration that if the land has been transferred to another, or has been sold as forfeited under decree, it shall be discharged. Or if it be found that the land proceeded against is not really forfeited, it shall be discharged. Surely all this is within the competency of the Legislature. It is but a repetition of prior provisions. It simply pertains to remedy by authorizing the commissioner to recall his report and abandon a sale, and thus do away with useless further steps in a suit originated by him, after further investigation. The state sold under decree and got the purchaser's money, and morally she should make it good by the transfer of any title in her.

The Act of 1905 in section 19 provides that any right or title of the state at the date of the sale or conveyance thereof by a commissioner of school land under order of a court in proceedings to sell as school land, however such title of the state may have been derived, shall be deemed to have passed to the grantee thereof under such sale, notwithstanding any irregularity or error in the suit or sale or con-

veyance or want of jurisdiction in the court to decree the sale. It confirms such sales and conveyances. This takes no title away from the former owners. The state simply confirms its own proceedings. In its own suits it can waive irregularity, or even want of jurisdiction in such suits as these, they being purely proceedings by the state as a means of selling its own absolute property. Without such act of validation the state would be estopped to deny jurisdiction of the court or to take exception to irregularity or informality of proceeding. See authorities cited in *Cecil* v. *Clark*, 44 W. Va. on page 674. But aside from that principle of estoppel, surely it cannot be said that the state is without constitutional power to validate its own conveyances or its proceedings for itself in its courts. As above said, such suits are simply suits of the state to sell its own land. An act of Congress was passed pending a suit by the government to remove cloud on its title, providing that no patent should be vacated against a *bona fide* purchaser, and confirmed the particular act. It was held that though this act took away jurisdiction of the court, the act confirming the patent was valid and amounted to a grant and barred the government's suit. *U. S.* v. *Union Pacific*, 165 U. S. 482. In *U. S.* v. *Winona St. Paul R. R. Co.*, 165 U. S. 463, the court said: "It is true this act is passed after the commencement of this suit—indeed, after the decisions of the court of appeals—but it is none the less an act to be considered. There can be no question of the power of Congress to terminate by legislation any suit brought to assert simply the rights of the government. This suit was instituted by the attorney general in obedience to the command of Congress as expressed in the Act of 1887, and Congress could at any time prior to the final decree in this court direct the withdrawal of such suit; and it accomplishes practically the same results when, by legislation within the unquestioned scope of its powers, it confirms in the defendants the title to the property which it was the purpose of the suit to recover." Such confirmatory acts affecting the state have been frequently sustained. *Durand* v. *Martain*, 120 U. S. 266-71; *Landes* v. *Brent*, 10 How. 348; 8 Cyc. 765. They are new grants. See *Randall* v. *Kreiger*, 23 Wall., 90 U. S. p. 448. What right has King

to interpose an objection to this feature of the act? It is
the State's suit. The parties whose land had been forfeited
had no say, nor can King complain that the act consequently
affects him.

Another clause of section 19, Acts 1905, says, that if land
sold under court decree was charged with taxes, and the
grantee has paid all taxes assessed for at least five successive
years, and the land was not at the date of the act forfeited
in the name of such purchaser under decree, then all the
right of the state acquired by forfeiture of another title
should be granted and relinquished to such purchaser. This
feature of the act cannot be questioned. The state has al-
ways through many years transferred to other claimants,
meritorious in its eyes, titles acquired by forfeiture or
escheat, in order to merge and unify conflicting titles
and vest them in one person, and perfect title and give
peace and repose to settlers, and improve the country.
The state should make her sale good with any title she
may have.

Fault is found with those provisions of the Act of 1905
authorizing the dismissal at once of the state's suits upon
its appearing that land of certain defendants is not liable.
It seems to be thought that this is hasty action, and that
those defendants and their lands should be kept in pro-
tracted litigation until the full disposition of the suit. Is
that the objection? If so, it is untenable. It is common
chancery practice where there are numerous defendants with
separate interests to dismiss as to them when their cases are
ready for hearing, and continue the suit as to others. In
this suit there are many, many defendants with separate
claims of title to separate tracts, one's case having nothing
to do with that of another. If the case justifies dismissal,
why should such a defendant be kept in court? Not only
did the Act of 1905 authorize his prompt dismissal from the
suit, but section 6 of chapter 105, as enacted by chapter 24,
Acts of 1893, in force when King came into the case, com-
manded the court, "If at any time during the pendency of
the suit it shall appear to the court that any part of any
tract of land in question therein," had been sold as school
lands under decree or transferred under section 3, Article
XIII. of the Constitution, to dismiss the bill as to such part

and proceed with the suit to a final decree as to the remainder. Upon the defendant's showing the non-liability of his land, he would be entitled to dismissal, by chancery practice, without wading through protracted litigation of others; but the Legislature has commanded it.

It is said that the Act of 1905 is violative of the Fourteenth Amendment of the Federal Constitution because it takes away property without due process of law. What property had King to be taken away? It had gone to the state, under her forfeiture laws. But it is said that the forfeiture laws are repugnant to that amendment. We have several times held that such is not the case, and we decline to reopen or reconsider this question, and will simply refer to the cases. *King* v. *Mullins*, 171 U. S. 404; *Webb* v. *Ritter*, 60 W. Va. 193, pts. 27, 28; *State* v. *Sponaugle*, 45 *Id.* 415, and cases there cited.

I repeat that the Act of 1905 does not take from King anything which he had under former law; it made no further restriction, its new provisions relating only to the prescription of evidence and procedure, matters within the power of the Legislature without infringment upon the Constitution. But suppose the act did so. I hold that it would be within the legislative power. What kind of a suit is it? A suit of State to sell its own land, not a suit to secure redemption for King. The state need not have instituted the suit or allowed redemption. There was no duty on the state to allow redemption. It was a mere grace, not obligation, out of which no vested right in King could grow. The title was in the state; King had no right of redemption which the state by legislation could not qualify or even repeal. The state as to its own absolute property can dictate terms of grace, mere grace.

From first to last "the whole history of legislation of Virginia and of this state on land titles show a strong and manifest purpose to protect the rights of actual settlers and occupants of land against the assertion of abandoned claims and neglected surveys held by adventurers and delinquent owners." *Garret* v. *Ramsey*, 26 W. Va. 345. The Court by JUDGE SNYDER, said that the whole history of this legislation showed a most earnest and determined effort on the part of the Legislature, the Judiciary and the people by the consti-

tution to " destroy and annihilate the titles of delinquent owners, who should, after every reasonable opportunity had been given them to comply with the law, continue in de- default, and to protect actual settlers and those not in de- fault." The Act of 1905 is nothing more than one to sub- serve and facilitate this settled policy, and by provisions as to evidence further the end.

It has been suggested by an *amicus curiae* after this opinion had been written that the Act of 1905 is unconsti- tutional because Article XIII., section 3, specifies three classes of persons to whom forfeited title shall go, while the act gives state title to persons not filling the demands of section 3, possessing less qualification to take the forfeiture, thus defeating the operation of section 3; that a person not qualified as that section demands might come in before one claiming under section 3, as for instance a purchaser under a deed from a school commissioner, with shorter posses- sion, or without any possession or payment of taxes. The answer is, as to the transfer of state title to former pur- chasers, that if at the date of the sale by the commissioner there was a person entitled to take under the constitution, the sale passed nothing, since the state had nothing to pass as title had already gone to the transferee under the constitu- tion. If we construe that provision of the Act of 1905, which simply says that land once sold shall not be sold again, not expressly giving the purchaser state title but as, in effect, giving to the purchaser state title, because forbidding its sale, we make the same answer, that is, if the state had no title, but another transferee had, there is no title to pass from the state, and as there was no person in condition to take state title, then there was nothing, no person, to prevent the gift of state title to the purchaser under the court sale. For instance, suppose a person in possession under a junior title, or under color of title—in short, one whose condition to take state title was not then mature, but becoming so, as one in possession nine years under the first class or four years under the last class—his status not yet ripe to take—could not the state grant away the land, and thus defeat the maturity of the man in pos- session for nine or four years? He had not yet matured a condition entitling him to take state title; no vested right,

not even an inchoate right.    Like a child, his right may be good as heir one day, but not yet.    Like a husband, his curtesy in his wife's separate land may come good some day, but as yet he has no inchoate right as a husband in maiden land by common law, who had inchoate curtesy.    Is the state bound to wait until his condition matures to take state title, before it can cut him off by disposing of the land to another?    I say not.    An *amicus curiae* says that the state must wait till his condition ripens.    So, under this head, the result is, that if, at the sale, anybody had acquired state title under the Constitution, the purchaser at the school commissioner's sale got nought; but if a third person had not acquired the right of transfer, the state could give all her right to the purchaser at the school commissioner's sale. Nobody is hurt.

It is suggested that the Act, sec. 19, validates prior deeds, and is unconstitutional, if the state had no title at the date of sale.    The act simply transfers state title, if it had any.    If it had gone to another, the court sale passes no title.    The sale, it is said, would be void if the state had no title and legislation can not validate a void thing.    It may not do so as to others; but it can make it good as to itself.    8 Cyc. 766.

But our *amicus* argues another feature against the validity of the Act of 1905.    He says that Article XIII., section 3, of the Constitution, defines three classes of persons only who may take the state's title; whereas, this act creates a fourth class in purchasers at court sales by the commissioner of school lands.    Do we need authority to warrant us to say that a state legislature can do anything not forbidden by the state or federal constitution?    Where is the provision that shall keep it from transferring forfeited land to persons whom it shall select, in order to further the high public purpose of merging and settling conflicting titles, and furthering the settlement and improvement of the country, and suppress litigation?    The National Congress is limited.    It has no power but that given by express or incidental grant of the Constitution; whereas a state legislature is different; it can do anything not forbidden by the constitution.    *Pierce* v. *Kitzmiller*, 19 W. Va. 572; 8 Cyc. 771, 777.    This brings up the question, Does the Constitution forbid the legislature making a fourth class of trans-

ferees? It does not in words do so; but we are told that
it does so by implication in prescribing three classes to take.
Shall we overthrow an act intended and calculated to an-
swer an important public purpose, upon a mere implica-
tion, far-fetched? An axiom in law says that the court
shall not defy legislative will on mere implication, or mere
doubt, but only where its act is plainly, palpably, *contra*
the Constitution. *Bridges* v̇. *Shallcross*, 6 W. Va. 568.
The argument is that as the Constitution defines three
classes to take state title, that impliedly excludes others on
the principle that *expressio unius est exclusio alterius*. It
is going far for a court to apply that maxim to overthrow
legislative will in the disposition of state title to land deemed
proper by the law making power to subserve the public
welfare. I thought that upon this principle, as the Consti-
tution, Article XIII., section 6, denounced forfeiture, for
omission from taxation, of tracts of land "containing one
thousand acres or more," that logically excluded power in
the legislature to make another class for forfeiture in tracts
less than that quantity, but the court said that the legislative
power could not be denied by mere implication, citing much
valid authority and held good an act forfeiting tracts less
than one thousand acres for non-entry. *State* v. *Swan*, 46
W. Va. 128. The federal supreme court affirmed the de-
cision. *Swan* v. *State*, 188 U. S. 739. The point decided
by the latter court was, it is true, only that our forfeiture laws
are contrary to the Fourteenth Amendment requiring due
process, as that court could not say that the state decision
was right or wrong in passing on the validity of the act
under the State Constitution, as the supreme court follows
the state court in construction of a State Constitution. We
decline to say that the legislature, in making such fourth
class, infracted the State Constitution, on a prohibition
arising only from such implication. On the contrary, it may
be that the State Constitution by its words in Article XIII.,
section 4, justifies the creation of this so-called fourth class.
It says that state lands "not redeemed, released, transferred
or otherwise disposed of, the title whereto shall remain in
the state," shall be sold. This authorizes the sale only of
lands at the date of sale yet owned by the state, not trans-
ferred "or otherwise disposed of." This language, "not

otherwise disposed of," likely was intended to leave open to the legislature power to make other disposition of state lands than that prescribed for transfer under section three.

Who shall question the constitutionality of the Act? The state is not doing so. It may be doubted whether King can, he having no title because of forfeiture, his claim to redemption not being a vested property right. "The Constitutionality of a statute affecting real estate cannot be questioned by those who have no interest in such real estate." 8 Cyc. 790.

Some time after writing the above opinion, I conclude to add some authorities touching the question of the validity of our forfeiture laws as regards the Fourteenth Amendment, thinking they may be of some service for reference.

In *State* v. *Sponaugle*, 45 W. Va. 415, it is said that whether given action is due process depends upon the nature of the subject; that what would be due process in one instance would not be in another. In this instance we deal with that great power, in which the state is vested with power so wide, the power of taxation. There we remark, on authority of *Witherspoon* v. *Duncan*, 4 Wall. 210, " The states have, as a general rule, right of determining the *manner* of levying and *collecting* taxes on private property." We must not forget this. There we said that process of collection or enforcement of taxes long used, as in the two Virginias by forfeiture, had always been regarded, before the amendment, as due process. And *Kelly* v. *Pittsburg*, 104 U. S. 78, says that systems of taxation established are not affected by the amendment. In the *Sponaugle Case* it is said that due process does not always require judicial proceeding, and that tax collection does not. Reference was made in the *Sponaugle Case* to the case of *Murray* v. *Improvement Co.*, 18 Howard 272, where a distress warrant issued by an executive officer for a balance due from a collector of customs, under which sale of land was made, was held due process. There was no decree for sale. *McMillan* v. *Anderson*, 95 U. S. 37, says that suit is not necessary to collect taxes. Is the manner of enforcement of payment the established usual mode of the state? If so, it is due process under the amendment. *Hurtado* v. *California*, 110 U. S. 537. What

was due process before the amendment still is under it.
*Slaughter House Cases*, 16 Wall. 78

Since *King* v. *Mullin*, 171 U. S. 404, held our forfeiture
law not repugnant to the Federal Constitution, the case of
*State* v. *Swan*, 46 W. Va. 128, again sustained them, and on
appeal to the U. S. Supreme Court that court again held like-
wise, following the *Mullin Case. Swan* v. *State*, 188 U. S. 739.

In *United States* v. *Repentigny*, 5 Wall. 212, was a grant
to be forfeited on failure to improve. It was held that for-
feiture vested title in the goverment, and that "under our
system of legislative act, directing the possession and ap-
propriation of the land, is equivalent to office found. The
mode of asserting or assuming the forfeited grant is sub-
ject to legislative authority." Page 268. It was held that
forfeiture vested title in the government without judicial
declaration of forfeiture. In *McMicken* v. *United States*,
97 U. S, page 217, the Supreme Court said: "This court
has in several cases maintained the doctrine that an actual
entry or office found is not necessary to enable the govern-
ment to take advantage of a condition broken, and to re-
sume the possession of lands which have become forfeited.
It was so held in *United States* v. *Repentigny's Heirs*, 5
Wall. 211; *Schulenberg* v. *Harriman*, 21 *Id.* 44; and *Farns-
worth* v. *Minnesota & Pacific Railroad Co.*, 92 U. S. 49.
In *Repentigy's Case* the court says: "The mode of assert-
ing or assuming the forfeited grant is subject to the leg-
islative authority of the government. It may be after judi-
cial investigation, or by taking possession directly, under
the authority of the government, without these preliminary
proceedings." In *Farnsworth* v. *Minn. Pac. R. R. Co.*,
*supra*, it was held that if a grant to a railroad company
on condition of construction should be forfeited the for-
feiture may be declared by legislative act without judicial
proceedings. So, by those decisions and the decisions of
our courts upon our forfeiture laws, title at once vests in
the state, and right to actual possession would follow. The
state has title and constructive possession incident to title.
In *Fairfax's Devisees* v. *Hunter*, 7 Cranch, p. 622, Justice
Story said: "As to the first point we will not say that it
was not competent for the legislature by special act to have
vested the land in the commonwealth without an inquest of

office for the cause of alienage." And I think the case of *Soper* v. *Lawrence,* 201 U. S. 359, 50 Law Ed. 788, will sustain our forfeiture laws against the charge that they are void under the Fourteenth Amendment. A statute of Maine authorized the treasurer to convey wild land taxed and delinquent, and provided that payment of taxes and possession for twenty years under such deed should bar the former owner's right of action, was held consistent with that amendment. The title sustained arose from forfeiture. The Circuit Court of Appeals, Chief Justice Fuller present, expressed the decided opinion that our forfeiture laws are valid. *Read* v. *Dingess,* 60 Fed. R. 21. In *Smith* v. *Maryland,* 6 Cranch 286, held that an act confiscating land is good without office found. In Louisiana is a statute forfeiting land for delinquency. It was held not contrary to Fourteenth Amendment. *Morrison* v. *Larkin,* 26 La. Ann. 699. See *Owen* v. *Owen,* 25 S. C. 155. Such laws are stated to be constitutional in 27 Am. & Eng. Ency. L. 847. In 1st ed. 8 *Id.* 451, it is laid down that forfeiture may take place by legislative act, without office found, and that the common law rule of office found does not apply. *Kinney* v. *Beverly,* 2 Hen. & Mums. 317 so holds.

Again. These forfeitures are by constitution and statute, not by common law. " When forfeiture accrues at common law, nothing vests in the government until some legal step shall be taken for the assertion of the rights, and then for many purposes the doctrine of relation vests the title as of the time of the commission of the offense, If, however, a forfeiture is provided for by statute, it is said that the rule of the common law does not apply, and the thing forfeited may vest either immediately or on performance of some particular act, as shall be the will of the legislature. If the forfeiture is declared by statute in absolute terms, not in the alternative, it is held by the great weight of authority that the forfeiture takes place at the time the prohibited act is committed and the owner is divested of title *eo instanti,* the forfeiture operating as a statutory transfer of title to the government." 19 Cyc. 1362. We have the high authority of Chief Justice Marshall in *United States* v. *Grundy,* 3 Cranch 337, he saying " When a forfeiture is given by statute the rules of the common law may be dis-

pensed with, and the thing forfeited may either vest immediately or on performance of some particular act, as may be the will of the legislature." . For this proposition I cite the well considered case of *Oakland R. Co.* v. *Oakland B. &c. R. Co.*, 13 Am. R. 181. Desty on Taxation 782, states that "There may be a forfeiture without office found if the legislative intent be clear; it is complete by the mere legislative act. The common-law principle does not apply to taxation. It has been held in some states that a forfeiture cannot be perfected so as to divest the title of the owner without inquest of office; but otherwise in other states." That means that no inquest of office finding forfeiture need be to vest state with title. Our own cases explicitly say so.

If it be said that some of these cases were before the amendment I reply that I cite them to show that the procedure was the usual one, consistent with law of the land, and being due process before, so it is since the amendment. The amendment does not define due process; what was such before it came, is since. *Barbier* v. *Connelly*, 113 U. S. 27. Forfeiture laws prevailed in Virginia long, and have prevailed in this state long. Titles covering counties rest on them, and their overthrow at this late day would spread disaster wide.

*Affirmed.*